**FRANKE et al.**
**v.**
**WILTSCHEK et al.**
**No. 96, Docket 22843.**

United States Court of Appeals
Second Circuit.

Argued Oct. 8, 1953.

Decided Dec. 9, 1953.

Frank, Circuit Judge, dissented in part.

Sidney J. Leshin, New York City, for defendants-appellants.

William D. Burrows, New York City (Eyre, Mann & Burrows, New York City, on the brief), for plaintiffs-appellees.

Before CHASE, Chief Judge, and CLARK and FRANK, Circuit Judges.

CLARK, Circuit Judge.

This action seeking an injunction and an accounting of profits received is based upon the alleged misappropriation by defendants of trade secrets learned during and in consequence of a confidential relationship existing between them and the plaintiffs.

From 1943 to 1951, plaintiffs, citizens of New Jersey, manufactured certain compressed cotton bath sponges for Schiaparelli. The finished product was a pellet which when dropped into water expanded into a piece of cotton about four inches wide by six inches long. The process and utility of thus compressing sheets of unwoven fiber had been known to the art since at least 1913.

In early 1951, plaintiffs commenced experiments with the similar compression of woven fibers, and by September of that year had produced the product here in issue, a perfumed face cloth, compressed into the shape of a small drum which when immersed in water opened up to its original shape. The product was put on the market in October, under the name "Quettes," and sales multiplied rapidly thereafter.

In December of that year defendant Wiltschek, having seen the product in a New York store, called plaintiffs and sought an interview, representing that he and his partner, defendant Blatt, were interested in selling the item. Plaintiffs initially were not interested, but Wiltschek persisted and after several more calls a meeting was arranged between plaintiffs and Wiltschek and Blatt. The latter came to the plant and discussed the question of representing plaintiffs. In order to persuade plaintiffs of the desirability of the arrangement they claimed a sales force of thirteen men, though in fact they had none other than themselves. As the parties neared agreement, these defendants, at their own solicitation, were shown the process (thereby also learning its cost), the capacity of the plant, and some of plaintiffs' sales records in order to help them in effecting sales and assure them that supply would be adequate and the product attractive. Shortly thereafter, in late December, an agreement was reached whereby Wiltschek and Blatt were to represent plaintiffs for a trial period while they tested the appeal of the product with their clientele. Compensation was agreed upon and they were given samples, displays, and signs.

By mid-February these defendants had terminated the agreement and returned some of the sales equipment, stating that the line would not sell. It is doubtful whether they ever in good faith intended to sell plaintiffs' product, but the trial court found on ample evidence that by the end of January they had resolved to copy the product and market it for their own profit. In March, defendant Betti Pearson, Inc., a Massachusetts corporation of which Blatt and Wiltschek were directors and vice-presidents (their wives holding half of the issued stock), resolved by its board of directors to copy and market plaintiffs' product. The first lot of the product was put on the market in April under the name "Facelettes" at a lower price than "Quettes." This action was instituted in June, 1952, against the corporation and the individuals both as such and under three different trade names under which they had done business.

Our jurisdiction rests upon diversity of citizenship, 28 U.S.C. § 1332, and accordingly we must draw the controlling principles of substantive law from the law of the forum, New York, Pecheur Lozenge Co. v. National Candy Co., 315 U.S. 666, 62 S.Ct. 853, 86 L.Ed. 1103; Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487; Smith v. Dravo Corp., 7 Cir., 203 F.2d 369, 373, including New York's rules of the conflict of laws. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477; Smith v. Dravo Corp., supra, 7 Cir., 203 F.2d 369. Happily we need not attempt answer to the troublesome question whether a New York court

would look to the law of New Jersey, where the confidential relationship arose, the law of Massachusetts, where the accused product was manufactured, or that of New York, where it was sold,[1] or would merely content itself in any event with its own law of remedies, for all three jurisdictions subscribe to the same general principle. Where defendants obtain secret information by means of a confidential relationship, they shall be held accountable for its use to their own advantage at the expense of the rightful possessor. See authorities collected below.

Defendants argue that the heart of plaintiffs' process was revealed by an expired patent, and that the improvements thereon were unpatentable applications of mechanical skill. This totally misconceives the nature of plaintiffs' right. Plaintiffs do not assert, indeed cannot assert, a property right in their development such as would entitle them to exclusive enjoyment against the world. Theirs is not a patent, but a trade secret. The essence of their action is not infringement, but breach of faith. It matters not that defendants could have gained their knowledge from a study of the expired patent and plaintiffs' publicly marketed product. The fact is that they did not. Instead they gained it from plaintiffs via their confidential relationship, and in so doing incurred a duty not to use it to plaintiffs' detriment. This duty they have breached. Junker v. Plummer, 320 Mass. 76, 67 N.E.2d 667, 165 A.L.R. 1449, citing 4 Restatement, Torts § 757 and comment a (1939); Peabody v. Norfolk, 98 Mass. 452; Vulcan Detinning Co. v. American Can Co., 72 N.J.Eq. 387, 67 A. 339, 12 L.R.A.,N.S., 102; Tabor v. Hoffman, 118 N.Y. 30, 23 N.E. 12, 16 Am.St.Rep. 740; Spiselman v. Rabinowitz, 270 App.Div. 548, 61 N. Y.S.2d 138, appeal denied 270 App.Div.

921, 62 N.Y.S.2d 608; Extrin Foods, Inc. v. Leighton, 202 Misc. 592, 115 N.Y. S.2d 429. See also Smith v. Dravo Corp., supra, 7 Cir., 203 F.2d 369; Schreyer v. Casco Products Corp., 2 Cir., 190 F.2d 921, certiorari denied 342 U.S. 913, 72 S.Ct. 360, 96 L.Ed. 683; 4 Restatement, Torts § 757 and comment a (1939); Nims, The Law of Unfair Competition and Trade-Marks §§ 141, 143a, 148 (4th Ed. 1947); Note, Protection and Use of Trade Secrets, 64 Harv.L.Rev. 976, 979, 982; cases collected in annotated note 170 A.L.R. 449, 488–490.

As was stated by Vann, J., in Tabor v. Hoffman, supra, 118 N.Y. 30, 36, 37, 23 N.E. 12, 13, 16 Am.St.Rep. 740:

"If a valuable medicine, not protected by patent, is put upon the market, any one may, if he can by chemical analysis and a series of experiments, or by any other use of the medicine itself, aided by his own resources only, discover the ingredients and their proportions. If he thus finds out the secret of the proprietor, he may use it to any extent that he desires without danger of interference by the courts. But, because this discovery may be possible by fair means, it would not justify a discovery by unfair means, such as the bribery of a clerk who, in course of his employment, had aided in compounding the medicine, and had thus become familiar with the formula. * * *

"The fact that one secret can be discovered more easily than another does not affect the principle. Even if resort to the patterns of the plaintiff was more of a convenience than a necessity, still, if there was a secret, it belonged to him, and the defendant had no right to obtain it by unfair means, or to use it after it was thus obtained. We think that

1. From the record it might be inferred, though it is quite unclear, that it was sold in other jurisdictions as well. But no claim has been made that any applicable local law is materially different from that

of the jurisdictions considered. Cf. Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 113, note 1, 59 S.Ct. 109, 83 L.Ed. 73.

the patterns were a secret device that was not disclosed by the publication of the pump, and that the plaintiff was entitled to the preventive remedies of the court."

To the same effect is the opinion of Garrison, J., speaking for the Court of Errors and Appeals of New Jersey in reversing a defendants' decree, in Vulcan Detinning Co. v. American Can Co., supra, 72 N.J.Eq. 387, 67 A. 339, 343, 12 L.R.A.,N.S., 102:

"Looking, now, a little more closely at the nature of the relief called for * * * we shall see, I think, that too much emphasis has perhaps been placed upon the element of absolute secrecy in the process, and that not enough stress has been laid upon the inequitable character of the defendants' conduct in making a use of such process that was inimical to the complainant's interests. * * * It is proper to say here that the plea that absolution should be granted by courts of equity from the observance of such private obligations whenever the public will thereby be the gainer cannot for a moment be entertained. The language of Justice Brown, cited in the brief of counsel, namely, 'It is as important to the public that competition should not be repressed by worthless patents as that the patentee of a really valuable invention should be protected in his monopoly,' has, as I read the case of Pope Manufacturing Company v. Gormully, 144 U.S. 224, 12 S.Ct. 632, 36 L. Ed. 414, no such import in the context in which it stands in Mr. Justice Brown's opinion. The notion that the multiplication of worthless patents inflicts as great an injury upon the public as the multiplication of worthless citizens would do, can never, I fancy, be accepted by a court of equity as a sound proposition on which to base a doctrine absolving trustees from the observance of their trusts."

It is clear that these principles apply to the case at bar, and plaintiffs are entitled to relief.

■ The court below after making appropriate findings of fact granted an injunction and ordered an accounting by defendants of the profits received. D.C. S.D.N.Y., 115 F.Supp. 28. The authorities cited *supra* show that this relief, in both its branches, is appropriate and indeed compelled by the facts proven and found by the court below. Although the point was not made or briefed by counsel, it is now suggested that relief should be limited either to damages or to an injunction only during the period until the trade by legitimate means has caught up with the plaintiffs and their secret has become general. And the reason assigned is that the novelty here is said to be slight and discoverable by a good mechanic. But even if defendants should seek it, the authorities do not justify the award of such uncertain, but presumably limited, relief.

In examining the authorities governing the remedies, we are again met with the situation earlier noted, namely, some doubt as to the appropriate law to be followed, but no controversy as to the ultimate result. Remedies might be held procedural and thus subject to the law of forum except for the reminder that the question is not merely that, but rather "does it significantly affect the result of a litigation for a federal court to disregard a law of a State that would be controlling in an action upon the same claim by the same parties in a State court?" Guaranty Trust Co. of New York v. York, 326 U.S. 99, 109, 65 S.Ct. 1464, 1470, 89 L.Ed. 2079, 160 A.L.R. 1231. And there is obvious truth in this observation in Restatement, Conflict of Laws, ch. 12, Introductory Note (1934): "The means provided for compulsion, or limitation upon the compulsion, which may be brought against the alleged wrongdoer are, in many cases, of almost equal practical importance to the declara-

tion of the validity of a plaintiff's claim." [2]

It appears, however, that the New York courts have not expressly considered whether local or foreign law should determine the propriety of an injunction in a given case. Nevertheless they have granted injunctions on foreign causes without discussion of the foreign rule, e. g., Niagara Falls International Bridge Co. v. Grand Trunk R. Co. of Canada, 212 App.Div. 705, 209 N.Y.S. 79, affirmed on this point 241 N.Y. 85, 148 N.E. 797; Madden v. Rosseter, 114 Misc. 416, 187 N.Y.S. 462, affirmed without opinion 196 App.Div. 891, 187 N.Y.S. 943, and there is every indication in their discussion of related issues that the issuance of an injunction should be treated as relating to the remedy, and hence governed by the *lex fori*, e. g., Reilly v. Steinhart, 217 N.Y. 549, 112 N.E. 468, reargument denied 218 N.Y. 660, 112 N.E. 749; Buffalo Forge Co. v. Fidelity & Casualty Co. of New York, 142 Misc. 647, 651, 256 N.Y.S. 329, 333. And if New York does apply its own rule it appears that we are bound; for a local rule which itself holds a legal principle to be procedural may for us be binding as substantive. Sampson v. Channell, 1 Cir., 110 F.2d 754, 128 A. L.R. 394, certiorari denied Channell v. Sampson, 310 U.S. 650, 60 S.Ct. 1099, 84 L.Ed. 1415, as approved in Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645, 144 A.L.R. 719.

It would appear, therefore, that New York law governs on this point. But the question remains largely academic; for the only way in which New York law seems at all unique is in the number and force of the pertinent decisions. The leading case not only for that jurisdiction, but—in view of its extensive citation—for the country, is still Tabor v. Hoffman, supra, 118 N.Y. 30, 37, 23 N.E. 12, 13, 16 Am.St.Rep. 740, where the court held a plaintiff "entitled to the preventive remedies of the court," without respect to whether "one secret can be discovered more easily than another" or that a defendant's resort to the secret "was more of a convenience than a necessity." That decision is particularly in point because there defendant's counsel and a dissenting opinion took special exception to the grant of an injunction, as distinguished from the award of damages at law. See 118 N.Y. 30, 32, 33, 38, 23 N.E. 12. Among recent cases which follow and apply it the following may be cited: Spiselman v. Rabinowitz, supra, 270 App.Div. 548, 61 N.Y.S.2d 138, appeal denied 270 App.Div. 921, 62 N.Y. S.2d 608; Biltmore Pub. Co. v. Grayson Pub. Corp., 272 App.Div. 504, 71 N.Y. S.2d 337; Petnel v. American Tel. & Tel. Co., 280 App.Div. 706, 117 N.Y.S.2d 294, 295; Sachs v. Cluett, Peabody & Co., 177 Misc. 695, 31 N.Y.S.2d 718, per Shientag, J.; Smith v. Dravo Corp., supra, 7 Cir., 203 F.2d 369; Schreyer v. Casco Products Corp., D.C.Conn., 97 F.Supp. 159, 168, affirmed on this issue, 2 Cir., 190 F.2d 921, certiorari denied 342 U.S. 913, 72 S.Ct. 360, 96 L.Ed. 683; International Industries, Inc. v. Warren Petroleum

2. Of course it has long been clear that the current rule, pressed to its dryly logical extreme, might have a vastly deleterious effect on the operation of the federal rules; this has been discussed at considerable length by many text writers, including the author of this opinion. See, e.g., Clark, *State Law in the Federal Courts*, in Jurisprudence in Action 59, 89–93, 106–109, with articles and texts cited in notes 138–144 (1953). But the solution of this problem is for the Supreme Court; and we cannot turn our backs upon the result, particularly when it has been strongly re-emphasized in the late cases, Ragan v. Merchants Transfer & Warehouse Co., 337 U.S. 530, 69 S.Ct. 1233, 93 L.Ed. 1520; Woods v. Interstate Realty Co., 337 U.S. 535, 69 S.Ct. 1235, 93 L.Ed. 1524, and Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528, with only Justice Rutledge dissenting on the point at all pertinent here, 337 U.S. 557, 69 S.Ct. 1231. And certainly there is little reason to expect a reversal of current trends in a case where the issue is, as noted below, substantially academic because of lack of difference in the underlying law.

Corp., D.C.Del., 99 F.Supp. 907, 914; Schavoir v. American Rebonded Leather Co., 104 Conn. 472, 133 A. 582, 583; and see also Nims, The Law of Unfair Competition and Trade-Marks §§ 141, 143a, 148 (4th Ed. 1947); Note, Protection and Use of Trade Secrets, 64 Harv.L. Rev. 976, 982. Thus apt in its facts and citation of authorities is the late case of Extrin Foods, Inc. v. Leighton, supra, 202 Misc. 592, 115 N.Y.S.2d 429, where Justice Hart enjoined the use of a discoverable formula for the preparation of certain flavoring products and ordered an accounting of profits.

As the several cases cited earlier in this opinion show, there is nothing singular in this aspect of New York law. In citing a multitude of cases to the point that an inventor or discoverer "will ordinarily be granted an injunction" against use of a formula or trade secret, the editors of a lengthy annotation of cases in 170 A.L.R. 449, 488–490, say that in fact "most of the cases are injunction cases" and cite only two insignificant or inapposite cases to the contrary. See to like effect Spiselman v. Rabinowitz, supra, 270 App.Div. 548, 61 N.Y.S.2d 138, appeal denied 270 App. Div. 921, 62 N.Y.S.2d 608. We have found no case authority to throw doubt on this law. So, indeed, if a search be made for "federal law" so-called, the result must be the same on existing authorities, as we have pointed out above; see, for example, the discussion below and in our court in Schreyer v. Casco Products Corp., supra.

The suggestion for a more limited remedy appears to come from a single sentence at the end of comment b of 4 Restatement, Torts § 757 (1939). There, after a lengthy discussion of protection for trade secrets in unexceptional form and definitely in accord with the cases cited above, with indeed stress upon the protection as "against breach of faith" rather than "reward to the inventor," as in the case of the "patent monopoly," the suggestion is added that, if "the secret consists of mechanical improvements that a good mechanic can make without resort to the secret, the wrongdoer's liability may be limited to damages, and an injunction against future use of the improvements made with the aid of the secret may be inappropriate." The tentative and conditional nature of the suggestion is obvious on its face. Though its precise meaning is not clarified by reference to any precedent, we are convinced that it is pressed beyond its intent if employed to restrict or limit relief on facts such as are disclosed in this record.

We have already called attention to the earlier precise statement of principles in both comments a and b of 4 Restatement, Torts § 757, with their careful and discriminating contrast between the protection for an invention, where novelty and inventiveness are requisite, and for a trade secret, where breach of faith and reprehensible conduct justify the relief. It could hardly have been the intent of the restaters to take back or nullify this careful formulation by an offhand repudiation at its end. And the language seems but the statement of the rather obvious principle that equity will not attempt an injunction when it would be vain and foolish, when in truth the supposed secret is known or knowable to the world. See also Note, Protection and Use of Trade Secrets, supra, 64 Harv.L.Rev. 976, 983.[3]

There may, it seems, be considerable danger in stressing in this branch of the law the assumed ability of a "good mechanic," a concept often useful in highlighting the lack of novelty of an alleged

---

**3.** If an injunction actually proves useless in practice or becomes out of date, that situation can be taken care of through the ordinary processes of equity, without need of insertion of any confusing caveat in the original decree. See F.R. 60(b), subd. (5); United States v. Swift & Co., 286 U.S. 106, 114, 115, 52 S.Ct. 460, 76 L.Ed. 999; Moore & Rogers, Federal Relief from Civil Judgments, 55 Yale L.J. 623, 643, citing cases.

patent. Even as to patents the capability of that ubiquitous genius has been questioned and his destructive effect on the law of inventions somewhat deplored. Be that as it may, there is positive danger in resort to the same device to justify the marauding instincts of trust violators, since thereby the carefully built law of trade secrets may be destroyed as a practical matter and such business assets be left open to hijacking from all sides. In practice the complicated and novel device is likely to be patented, leaving protection of simpler devices wrongly exploited to this branch of the law.[4] And since the ability of a "good mechanic" is quite an imprecise concept, its destructive potentialities in this area under the natural tendency of restrictive precedents to accumulate can be forecast. So here the idea of pressing a face cloth into a small mass by use of an hydraulic or other press may seem (and perhaps be) a simple idea, easily conceivable. But actual experience demonstrated that the idea was not so readily understood, even with the teaching at hand of an expired patent as to the compressing of sponges. The entire conception, involving the type, size, and actual method of compressing the cloths, together with the apparently attractive touch of adding some perfume at a chosen stage of the process, was obviously not apparent to such markedly interested observers as the defendants until they obtained all the details by pretending to be ready to market the product for plaintiffs. Also no more

apparent to them were either the low cost of production or plaintiffs' sales records, knowledge of which may well have been primary factors in defendants' decision to violate their duty.

This in any practical sense is not the type of "improvement" possible "without resort to the secret" to which the restaters had reference. At any rate there is nothing in the precedents suggesting that this breach of trust is legally permissible upon payment of limited damages assessed for a time by a court. However "roguish" equity may have been in the past,[5] in modern law, courts of equity sit, as do courts of law, to protect rights and enforce duties by means of the remedies which they administer. Pomeroy, Specific Performance § 46 (3d Ed. 1926); 5 Corbin on Contracts § 1136 (1951); Walsh on Equity §§ 8, 53 (1930); 4 Restatement, Torts §§ 933, 938 (1939).[6] It is to be noted that we do not have here the issue as to a trial judge's power, on occasion, to withhold injunctive relief; rather the issue is whether we should force the judge to the exercise of a "discretion" which his opinion shows he would abhor; see 115 F.Supp. 28, 30, 31.

At the outset of their restatement of this subject, the distinguished authors made an acute observation on the trend of the law which has since been often quoted. They said: "But the tendency of the law, both legislative and common, has been in the direction of enforcing increasingly higher standards of

4. "Indeed, the fact that the discoverer of a process or formula may not be able to secure property rights in it by means of the patent law may be the very reason why he seeks the protection of secrecy. He must have a secret, that is, something not known to the public or in his trade; and the character of the article produced might make so obvious the process or formula by which it is made that the very putting of it upon the market destroys the secret of its production. But this does not mean that the possibility of its discovery, by chemical analysis or experimentation, will itself put an end to the rights of the originator." Schavoir v. Ameri-

can Rebonded Leather Co., 104 Conn. 472, 133 A. 582, 583.

5. The reference is to Seldon's Table Talk, quoted in 1 Holdsworth, Hist.Eng.L. 467, 468 (5th Ed.1931), and Walsh on Equity § 8 (1930).

6. In the single modern instance of "balancing the equities" in awarding injunction to nuisances against real property, the courts are most hesitant in granting grace to a conscious wrongdoer. See, e. g., Smith v. Staso Milling Co., 2 Cir., 18 F.2d 736; 4 Restatement, Torts § 941, comment b (1939); Walsh on Equity § 56 (1930).

**500**

fairness or commercial morality in trade. The tendency still persists." 3 Restatement, Torts, ch. 35, p. 540 (1938), quoted with approval in Q-Tips, Inc. v. Johnson & Johnson, 3 Cir., 206 F.2d 144, 145, per Goodrich, J., and Ross-Whitney Corp. v. Smith Kline & French Laboratories, 9 Cir., 207 F.2d 190, 196 note 17, per Stephens, J. The present case surely is not one where we are disposed to attempt to reverse the trend.

Affirmed.

FRANK, Circuit Judge (dissenting in part; i. e., as to the nature of the relief).

I entirely agree that plaintiffs are entitled to relief, and disagree solely as to the kind of relief (i. e., a perpetual injunction). I think money damages will be wholly adequate. To make my position clear, I must first high-light the facts of this case which I think indisputable:

(1) When defendants first came on the scene, plaintiffs were already marketing their wash-cloths publicly, so that anyone could buy them. (2) A previously expired patent (not owned by plaintiffs) revealed all the elements of plaintiffs' process for making these cloths, excepting only two nonpatented and nonpatentable features, i. e., (a) plaintiffs compressed a perfumed wash-cloth instead of a perfumed rectangle of woolen material or ball of absorbent cotton, described in the patent, and (b) plaintiffs made some mechanical changes in the hydraulic press described in the patent.[1] (3) Those two slight, added features any ordinary, moderately adept workman—not necessarily a "skilled mechanic"—could easily have discovered in a short time from a study of plaintiffs' publicly-marketed wash-cloths. (4) But without such a study, defendants learned of these features through establishing a confidential relation with plaintiffs. (5) By breaching the obligations of that relation, defendants wrongfully used what they had learned from plaintiffs. (6) All that plaintiffs lost, however, from defendants' misconduct was plaintiffs' advantage over competitors for the brief period which would end when such competitors discovered those unpatented features of plaintiffs' process through a study of plaintiffs' wash-cloths.

On these facts, my colleagues conclude that the trial court lacked all discretion concerning the relief to be accorded plaintiffs, and was obligated to enjoin defendants "perpetually" from making or selling wash-cloths like plaintiffs'.[2] In reaching that conclusion, my colleagues assert that the New York courts have adopted an inflexible rule that, in cases of this class, they must always issue a perpetual injunction, that those courts have no discretion whatever to grant any lesser relief, such as a decree for money only. I think this is not the New York rule (as I shall try to show later). But what makes my colleagues' decision important and deeply disturbing is that they assert the following proposition:

If the highest court of a State rules that, in a certain class of cases, equity is stripped of all discretion and must always grant, automatically, a perpetual injunction, then (say my colleagues) thanks to Guaranty Trust Company of New York v. York, 326 U.S. 99 [65 S. Ct. 1464, 89 L.Ed. 2079], a federal court, sitting in that State in a diversity case falling within that class of cases, must likewise surrender all discretion and mechanically issue a perpetual injunction.

My colleagues base this proposition on but a portion of a sentence in Guaranty Trust Co. of New York v. York, 326 U.S. 99, at page 109, 65 S.Ct. 1464, at page 1470, 89 L.Ed. 2079. But I quote,

1. The terms of the patent are set forth in the Appendix to this opinion.
2. The order provides that the defendants "* * * are hereby perpetually enjoined from making and selling full sized face cloths compressed and sold as hard cylinders under whatever brand or name."

as follows, the entire sentence, in its context, which shows, I think, that my colleagues have overlooked precisely that part of the Court's opinion which applies to the case at bar: "And so the question is not whether a statute of limitations is deemed a matter of 'procedure' in some sense. The question is whether such a statute concerns *merely the manner and the means by which a right to recover, as recognized by the State, is enforced,* or whether such statutory limitation is a matter of substance in the aspect that alone is relevant to our problem, namely, does it significantly affect the result of a litigation for a federal court to disregard a law of a State that would be controlling in an action upon the same claim by the same parties in a State court?" [3] Nor was this a casual comment. For the Court also said: [4] "State law cannot define the remedies which a federal court must give simply because a federal court in diversity jurisdiction is available as an alternative tribunal to the State's courts. Contrariwise, a federal court may afford an equitable remedy for a substantive right recognized by a State even though a State court cannot give it. * * * When, because the plaintiff happens to be a non-resident, such a right is enforceable in a federal as well as in a State court, the forms and mode of enforcing the right may at times, naturally enough, vary because the two judicial systems are not identic." [5]

My colleagues' opinion in this respect conflicts directly with two rulings of the Third Circuit uttered since Guaranty Trust Co. of New York v. York; Anheuser-Busch v. DuBois Brewing Co., 3 Cir., 175 F.2d 370, 373; Campbell Soup Co. v. Wentz, 3 Cir., 172 F.2d 80, 81–82. See also Black & Yates v. Mahogany Ass'n, 3 Cir., 129 F.2d 227, 233, 148 A. L.R. 841. Until today no other Circuit has disagreed with the Third. And it is perhaps not amiss to note that when once before this court extended the York case doctrine, purporting with marked confidence to apply its "clear implications," the Supreme Court reversed. See Holmberg v. Armbrecht, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743, reversing, 2 Cir., 150 F.2d 829, 832.[5a]

My colleagues' present interpretation of Guaranty Trust Co. of New York v. York is noteworthy for, under it, in diversity cases, many of the Federal Rules of Procedure, 28 U.S.C. would go down the drain, since they do "significantly affect the result of litigation." Consider, for instance, Rule 43(a) providing that evidence excluded in a state court is admissible if previous federal rulings in equity cases would admit it; the application of that Rule may lead to a federal decision not possible if the case had been tried in a state court. What of Rule 38 in a state where, in a suit of an equity character, a jury is demandable as of right? Think, indeed, of Rule 2, as to the joinder of "legal" and "equitable" claims in a diversity suit in a federal court in New York. Will not Ring v. Spina, 2 Cir., 166 F.2d 546, 550, often yield a markedly different result than

---

**3.** Emphasis added.

**4.** 326 U.S. at page 106, 65 S.Ct. at page 1468. See Levinson v. Deupree, 345 U. S. 648, 652, 73 S.Ct. 914.

**5.** 326 U.S. at page 108, 65 S.Ct. at page 1469.
   See also 326 U.S. at page 106, 65 S. Ct. at page 1468, note 3, discussing Pusey & Jones Co. v. Hanssen, 261 U.S. 491, 43 S.Ct. 454, 67 L.Ed. 763. And see Kelleam v. Maryland Casualty Co., 312 U.S. 377, 61 S.Ct. 595, 85 L.Ed. 899.

**5a.** There this court said: "The York case indeed went further than this. The essence of its holding is that limitations go to the substantive rights of the parties, which ought not to vary with the remedy; and hence there should be no distinction in limitation periods in diversity cases between those arising under the federal court's equity powers and those arising in law, provided the respective state statutes and decisions make no such distinction. And no sound reason is offered why such a distinction should be made when, as here, the right sought to be enforced is created by a federal statute. * * * Such a divergence in treatment is opposed not only to common sense, but also to the clear implications of the York case."

would eventuate if DiMenna v. Cooper & Evans Co., 220 N.Y. 391, 115 N.E. 993, governs? The sensible approach to such problems, suggested by Judge Clark in 1941, is surely that the federal Rules should be followed "unless some very vital interest of state law is being set aside."[5b]

If my colleagues are right about the New York rulings, a correct reading of the York case is distinctly relevant, as my colleagues recognize. For if my interpretation of the York case is correct, then, regardless of the New York rulings, we should carefully consider the discussion in § 757 of the Restatement of Torts, Comments a and b, for it almost literally describes the facts of this case. It is there said that the duty of persons in a position like defendants does not stem from the ownership by plaintiffs of any "property right" in the secret.[6] It derives from a "general duty of good faith" which calls for legal "protection * * * against breach of faith and reprehensible means of learning another's secret."[7] Consequently, so the Restatement reports (§ 757, Comment b), while a protected trade secret "may be a device or process which is patentable," it "need not be that. It may be a device or process which is clearly anticipated in the prior art or one which"—as here— "is merely a mechanical improvement that a good mechanic can make. Novelty and inventiveness are not requisite for a trade secret as they are for patentability. These requirements are essential to patentability because a patent protects against unlicensed use of the patented device or process even by one who discovers it properly through independent research. The patent monopoly is a reward to the inventor. But such is not the case with a trade secret." The legal protection given such a secret is so limited that "it is not appropriate to require * * * the kind of novelty and invention which is a requisite of patentability."

But, significantly, the Restatement at once continues as follows: "The nature of the secret is, however, an important factor in determining the kind of relief that is appropriate against one who is subject to liability under the rule stated in this Section. Thus, if the secret consists of a device or process which is a novel invention, one who acquires the secret wrongfully is ordinarily enjoined from further use of it and is required to account for the profits derived from his past use. If, on the other hand, the secret consists of mechanical improvements that a good mechanic can make without resort to the secret, the wrongdoer's liability may be limited to damages, and an injunction against future use of the improvement made with the aid of the secret may be inappropriate." It is this statement which my colleagues lightly call "offhand" and reject. I cannot agree. Professor Harry Shulman, the Reporter of this portion of the Restatement,[8] is a scholar known for his acumen, his poise and care. The Advisers included two eminent federal judges, Learned Hand and Augustus N.

---

5b. Clark, The Tompkins case and The Federal Rules, 24 Am.Jud.Soc.J. (1941) 158, 161. Judge Clark added: "Unless this is done one may say that the federal rules will be endangered," and that "more than half the rules can be questioned if some of the views already in print as to the wide content of 'substance' are sound." See also, Clark, Procedural Aspects of The New State Independence, 8 Geo.Wash.L.Rev. (1940) 1230; Clark, State Law in The Federal Courts, in the volume Jurisprudence In Action (1953) 52, 108–109; Clark, Book Review, 36 Cornell L.Q. (1950) 181, 183–184.

6. Holmes, J., in E. I. Du Pont de Nemours Powder Co. v. Masland, 244 U.S. 100, 102, 37 S.Ct. 575, 576, 61 L.Ed. 1016, said: "The word 'property' as applied to trademarks and trade secrets is an unanalyzed expression of certain secondary consequences of the primary fact that the law makes some rudimentary requirements of good faith." Cf. Holmes, J., in Chadwick v. Covell, 151 Mass. 190, 194, 23 N.E. 1068, 6 L.R.A. 839.

7. See Smith v. Dravo Corp., 7 Cir., 203 F. 2d 369, 373–374, and cases there cited.

8. See 4 Restatement, Introduction.

Hand, and two lawyers, later to become federal judges, highly respected for their learning and thoughtfulness, Goodrich and Wyzanski.[9] None of these men was likely to endorse a careful formulation and carelessly follow it by "an offhand repudiation at its end."

Their differentiation as to remedies makes much sense, for these reasons: (a) The harm done by a defendant's breach of a plaintiff's confidence is the use of the secret to the plaintiff's "loss" or "detriment." (b) By defendant's wrong he deprives plaintiff of a trade secret defined as something which gives plaintiff "an opportunity to obtain an advantage over competitors." (c) Where the device or process consists of a "novel invention," the plaintiff may have chosen not to patent it—which would limit the period of his monopoly—but to keep the invention to himself with the expectation that no one, except those in his confidence, will discover the secret, so that his monopoly will endure for an unlimited time. If the defendant comes to know the secret of such an invention by improper means his use of this knowledge will cause a loss to plaintiff for an indefinite future period during which plaintiff will lose his "opportunity to obtain an advantage over competitors." Wherefore a perpetual injunction affords a proper protection—a protection as enduring as the monopoly grounded on the secret invention. (d) But where the secret involves only a slight, non-patentable and easily-discoverable improvement, competitors will soon, in all probability, legitimately learn how to contrive this improvement. Consequently, defendant's wrong has caused a loss of plaintiff's "advantage over competitors" which, at most, would not have lasted long. Perpetually to enjoin defendant in such circumstances would be to harm him without regard to the loss or detriment suffered by plaintiff.

In short, such an injunction—continued beyond the time when, in all likelihood, the trade, by legitimate means will catch up with the plaintiff—is sheer punishment, nothing else. In a closely related tort field, when a defendant has knowingly copied plaintiff's trade-name, a court will not issue a perpetual injunction against defendant's doing business but will allow defendant to continue in business if he adopts a revised name that is not likely to confuse:[9a] When the damage to plaintiff ceases, the restraint of defendant ends; the restraint does not continue thereafter for the purpose of punishing the wrongdoer.

So here, I think no injunction should issue. True, these defendants have done a legal wrong and acted unethically. But that is also true in many a tort case where there is no punitive or deterrent element in the judgment except that contained in the exaction of damages that will roughly compensate the plaintiff;[10] when, in such a case, damages achieve the end of thus compensating plaintiff, the possibility that they do no more to punish the defendant is not regarded as showing that damages are so "inadequate" as to justify equitable relief; nor has the failure to issue injunctions in such cases been regarded as encouragement to wrongdoers. No more should it be so regarded in the case at bar. To say that a denial of a perpetual injunction in a case like this will be to destroy any real requirement of good faith in business-trust relations is to assert confidently that the grant of such an injunction would serve, punitively, to deter breaches of good faith in such relations. But as there is no basis in our present state of ignorance, about the deterrent effect of judgments in civil suits for

9. Ibid.

9a. See, e. g., Warner & Co. v. Eli Lilly & Co., 265 U.S. 526, 532–533, 44 S.Ct. 615, 68 L.Ed. 1161.

10. As to the punitive or deterrence element in compensatory damages, see, e. g., Morris, Punitive Damages in Tort Cases, 44 Harv.L.Rev. (1931) 1173; James, Social Insurance and Tort Liability, 27 N.Y. U.L.Rev. (1952) 537, 539; Jaffe, Damages for Personal Injury, Law and Contemporary Problems (1953) 219.

such an assertion, I think we ought not rely on it to justify punitive injunctions. The courts in civil suits do not attempt to punish breaches of duty even by express trustees unless the misconduct "has the character of outrage frequently associated with crime," [11] in which event the punishment takes the form of punitive damages. I think defendants' misconduct here was not so heinous as to render appropriate the imposition of such damages.[12]

And so I come back to the federal rulings as to equitable remedies. Repeatedly, the Supreme Court has underscored their flexible, discretionary character; has said that equitable relief should turn on the necessities of the particular case; has repudiated the notion that equitable remedies, including injunctions, should be used punitively. Thus in Hecht Co. v. Bowles, 321 U.S. 321, 329, 64 S.Ct. 587, 591, 88 L.Ed. 754, the Court said concerning an injunction: "We are dealing here with the requirements of equity practice with a background of several hundred years of history. Only the other day we stated that 'An appeal to the equity jurisdiction conferred on federal district courts is an appeal to the sound discretion which guides the determinations of courts of equity.' Meredith v. City of Winter Haven, 320 U.S. 228, 235, 64 S.Ct. 7, 11, [88 L.Ed. 9]. The historic injunctive process was designed to deter, not to punish. The es-

sence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." [13] See, e. g., Di Giovanni v. Camden Fire Ins. Association, 296 U.S. 64, 71–72, 56 S.Ct. 1, 5, 80 L.Ed. 47: "Equity not infrequently withholds relief which it is accustomed to give where it would be burdensome to the defendant and of little advantage to the plaintiff. See Harrisonville, Mo. v. W. S. Dickey Clay Mfg. Co., 289 U.S. 334, 335, 338, 53 S.Ct. 602, 77 L.Ed. 1208, and cases cited; cf. Willard v. Tayloe, 8 Wall. 557, 19 L.Ed. 501; Hennessey v. Woolworth, 128 U.S. 438, 9 S.Ct. 109, 32 L.Ed. 500; McCabe v. Matthews, 155 U.S. 550, 553, 15 S.Ct. 190, 39 L.Ed. [253] 256." [14]

The New York rulings are to the same effect: Equitable relief is to be adapted, in the sound discretion of the Chancellor, to the circumstances or exigencies of the particular case; such relief will not be granted if it will work hardship and injustice to the defendant and very little if any benefit to the plaintiff; [14a] there is no absolute right to an injunction.[15] In a trade secret case, in particular, an injunction will be granted only if plaintiff has no adequate remedy at law.[16]

My colleagues, however, cite Tabor v. Hoffman, 118 N.Y. 30, 23 N.E. 12, as holding that, whenever a defendant misuses a confidential relation by exploiting

11. See Prosser, Torts (1941) 11.

12. Some courts have held that equity will never give punitive damages.

13. See also Porter v. Warner Holding Co., 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L. Ed. 1332.

14. See Minneapolis & St. L. Ry. Co. v. Pacific Gamble Robinson Co., 8 Cir., 181 F.2d 812; Hygrade Food Products Corp. v. United States, 8 Cir., 160 F.2d 816; McComb v. Goldblatt Bros., 7 Cir., 166 F.2d 387, 390; Walling v. T. Buettner & Co., 7 Cir., 133 F.2d 306, 308.

14a. See, e. g., Hubbell v. Henrickson, 175 N.Y. 175, 180, 67 N.E. 302; Bloomquist v. Farson, 222 N.Y. 375, 380, 118 N.E. 855; Thomas v. Musical Mut. Pro-

tective Union, 121 N.Y. 45, 52, 24 N.E. 24, 8 L.R.A. 175; Lexington & Fortieth Corporation v. Callaghan, 281 N.Y. 526, 529, 531, 24 N.E.2d 316; Kane v. Walsh, 295 N.Y. 198, 205–206, 66 N.E.2d 53, 163 A.L.R. 1351; Troster v. Dann, 83 Misc. 399, 145 N.Y.S. 56, 58; L. Daitch & Co. Inc. v. Retail Grocery & D. C. Union, 129 Misc. 343, 221 N.Y.S. 446, 447; May's Furs and Ready to Wear v. Bauer, 282 N.Y. 331, 26 N.E.2d 279; Nann v. Raimist, 255 N.Y. 307, 308, 174 N.E. 690, 73 A.L.R. 669.

15. Conger v. New York, West Shore & Buffalo Railroad Co., 120 N.Y. 29, 32, 23 N.E. 983.

16. McCall Co. v. Wright, 198 N.Y. 143, 157, 91 N.E. 516, 31 L.R.A.,N.S., 1249.

a secret process, invariably the defendant will be permanently enjoined, no matter how easy it would have been to discover the secret without any confidential disclosure by the plaintiff. I think that is a mistaken version of the facts of that case, which were as follows: The plaintiff had invented and patented a pump. After the patent expired, he manufactured and sold a pump containing improvements on the original which he did not patent. These improvements were incorporated in patterns which he kept

secret. An independent contractor, hired by the plaintiff to repair these patterns, secretly made copies of them which the defendant used to manufacture pumps he sold in competition with plaintiff. The trial court found that, only with great difficulty, could anyone, merely from a study of the pump and the expired patent, learn to make a pump like plaintiff's. On these facts the trial court granted the injunction which was affirmed by the upper courts.[17] The dissenting opinion in the highest court,

17. See the opinion of the General Term of the New York Supreme Court, 41 Hun 5, 7–8: "This action was brought to restrain the defendant from manufacturing and selling pumps made from patterns copied and designed from the patterns designed by the plaintiff, and for damages. The trial court found as facts that the plaintiff is the inventor and owner of what is known as Tabor's rotary pump, and that he manufactures the same for sale; that he had spent a good deal of time, study, thought, labor and money to make and perfect patterns from which to manufacture the pump. * * * These improvements have never been patented and, consequently, the plaintiff is unable to claim any protection through the patent laws. He has invented and constructed patterns from which he has manufactured the improved pump. The pump so manufactured has been sold, and in that way given to the public; but the patterns from which it was manufactured have never been sold, but have always been kept subject to his own control and management. The sale of the machine does not amount to a publication of the patterns, plans and specifications from which the machine was constructed. It is possible that an individual may be able to procure plans and specifications and construct patterns from the machine that has been sold, and yet there are doubtless instances in which machinery is so complicated that it would be extremely difficult, if not impossible, so to do. In such a case the sale of the machine and its publication to the world would not enable others to manufacture and sell the same machine for the reason that the plans, specifications, patterns and devices by which the same was manufactured still remained a secret, locked up in the inventor's manufactory. Suppose, for instance, that the successful operation of the machine required it to be constructed

of a composition or combination of metals, which was the device and invention of the manufacturer; could it be said that the sale of the machine, to be devoted to the uses for which it was constructed, carried with it the right to the secret formula by which the inventor had compounded the material out of which it was constructed, or the manner in which the material had been treated and prepared for use?"

The Court of Appeals, 118 N.Y. 30, 35–36, 23 N.E. 12, said: "The precise question, therefore, presented by this appeal, as it appears to us, is whether there is a secret in the patterns that yet remains a secret, although the pump has been given to the world? The pump consists of many different pieces, the most of which are made by running melted brass or iron in a mold. The mold is formed by the use of patterns, which exceed in number the separate parts of the pump, as some of them are divided into several sections. The different pieces out of which the pump is made are not of the same size as the corresponding patterns, owing to the shrinkage of the metal in cooling. In constructing patterns it is necessary to make allowances, not only for the shrinkage, which is greater in brass than in iron, but also for the expansion of the completed casting under different conditions of heat and cold, so that the different parts of the pump will properly fit together and adapt themselves, by nicely balanced expansion and contraction to pumping either hot or cold liquids. If the patterns were of the same size as the corresponding portions of the pump, the castings made therefrom would neither fit together, nor, if fitted, work properly when pumping fluids varying in temperature. The size of the patterns cannot be discovered by merely using the different sections of the pump, but various changes must be made, and those changes can only be ascertained by a series of experiments,

maintaining that there was no case for equitable relief, admitted the difficulty of discovering the secret but relied on the following untenable arguments: The invention did not consist of the patterns but of the idea represented by them; and the defendant had no contractual relation with plaintiff. The majority opinion turned on the particular facts of the case, which differed markedly from those of the case at bar. Neither in the Tabor case nor elsewhere have the New York courts (or, for that matter, have any other courts) ruled that, regardless of the particular facts, in a trade-secret case, an injunction must always issue, and money damages will never suffice.

My colleagues' treatment of the New York trade-secret cases is, I think, an illustration of a practice to which Chafee has called attention: [17a] In an opinion in an equity suit, "observations on the facts are often intermingled with observations on the law. Hence, the judge may formulate what looks like a general proposition, which may be entirely correct as to the facts before him but is really inappropriate to other (though somewhat similar) facts. If his opinion is printed in the reports, a judge in another case may use this proposition as a precedent, without realizing that in large measure it is really like a jury verdict and ought to decide nothing as to future cases. In an appellate decision in equity, also, the same infusion of the facts into apparent propositions of law may occur with like consequences." Thus Lord Halsbury, in Colls v. Home & Colonial Stores [1904], A.C. 179, 184, said: "I think that the whole subject has been confused by certain decisions which were dependent on the facts proved, and were incautiously reported as laying down principles of law, when they were, in my view, only intended to be findings of fact in that particular case." [17b]

Even assuming, then, that Guaranty Trust Co. of New York v. York has the meaning my colleagues ascribe to it, there is nothing, I think, in the New York cases to require a muscle-bound decision here. Nor does anything in the Restatement [18] or in Corbin's Contracts [19] suggest any such rigidity.

involving the expenditure of both time and money. Are not the size and shape of the patterns, therefore, a secret which the plaintiff has not published and in which he still has an exclusive property? Can it be truthfully said that this secret can be learned from the pump, when experiments must be added to what can be learned from the pump before a pattern of the proper size can be made?"

17a. Chafee, Simpson and Maloney, Cases On Equity (1951) 1058–1059.

17b. See also Wason v. Sanborn, 45 N.H. 169: "Wherever a fixed and certain rule can be established, it is immensely important that it should be. But there is a large class of cases and of questions, where the circumstances admit of so numerous variations, that no rule can be framed comprehensive enough to reach them. In such cases decisions must be made in the exercise of a sound judgment upon all the circumstances and such decisions can furnish rules for new cases, only where the same circumstances occur, yet there is a constant striving to treat them as precedents, and to regard the expressions used by the courts in stating the grounds of their decisions, and which are true perhaps in regard to the case in hand, as universally true. The effect of this in cases depending in courts of equity, is marked and bad."

18. See Restatement of Torts, § 938, Comment b: "Injunction is a flexible remedy, capable of adjustment to the peculiar needs of the plaintiff in the particular situation. It is not stereotyped." Cf. § 941, Comment c (p. 714) to the effect that "the decision must turn, not on the advantage which the plaintiff would gain from the injunction, but on the hardship which he will suffer in the absence of injunction." And cf. Restatement of Contracts, § 367: "Specific enforcement of a contract may be refused if * * * (b) its enforcement will cause unreasonable or disproportionate hardship or loss to the defendant or third persons."

19. See Corbin, Contracts (1951) § 1136: "The 'adequacy' of money damages as a remedy must be determined with respect to the facts of each particular case; and there are many kinds of cases in which the answer cannot be said to have become stereotyped. The terms of the contract

True, there is a judicial "trend in the direction of enforcing increasingly higher standards of fairness or morality in trade." But the enforcement of those standards does not call for mechanistically issued decrees based on a concept of punishment for past misdeeds. It would be strange if today, when punishment of crime is becoming ever more flexible, individualized,[20] equity, in a stereotyped manner, were to use injunctions punitively and without regard to the particular facts of the cases.

I fail to comprehend my colleagues' reason for twice referring to the fact that, through the confidential relation, defendants obtained a knowledge of plaintiff's cost of production and sales records. My colleagues say that this knowledge may have stimulated defendants to violate their duty. But that fact has no bearing on the propriety of issuing an injunction when money damages will afford adequate relief.

I think that defendants should be obliged to do no more than to account to plaintiffs for damages and profits for the short period in which plaintiffs would have been free of competition, if defendants had not violated their duty. To be sure, this time limitation entails some conjecture. So, however, do many other measures of damages in cases where the presence of the conjectural element does not lead to equitable relief. Moreover, in a case like this, the rule applies that the proof of damages need not be too precise and that a considerable measure

of conjecture is proper, because defendants' own wrong caused whatever difficulties of computation exist. See, e. g., Package Closure Corp. v. Sealright Co., 2 Cir., 141 F.2d 972, 979; Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264–265, 66 S.Ct. 574, 90 L.Ed. 652.[21]

Difficult to reconcile with my colleagues' decision here is Foundry Services, Inc. v. Beneflux Corp., 2 Cir., 206 F.2d 214, 216, opinion by Judge Chase. There, but a few months ago, this court reversed a temporary injunction order restraining defendant from violating an agreement with respect to a secret process owned by plaintiff, saying of the injunction: "It serves to prevent the appellant from competing or from aiding others in competing with the appellee in the United States. The ordinary and natural result of such competition would be to dampen the sales of the appellee; but since any loss so caused could, if a wrong, be adequately redressed by money damages ascertainable upon proof, it does not constitute the irreparable injury necessary to justify an injunction *pendente lite*." [22] To be sure, there the injunction was not permanent; but the views expressed as to the adequacy of damages seem fully applicable here. The case shows also (contrary to what my colleagues seem to suggest) that a reversal of an injunction order for "abuse" of discretion on the ground that damages are adequate—although (as my colleagues say) the reversal "forces" the trial judge not to grant equitable relief—

---

must not be 'oppressive' or 'unconscionable,' and enforcement must not involve disproportionate hardship to the defendant or inconvenience to the public, or specific performance will not be decreed."

20. Williams v. People of State of New York, 337 U.S. 241, 247, 250, 69 S.Ct. 1079, 93 L.Ed. 1337.

21. The considerable expansion of this rule has been fairly recent; this may perhaps explain why, in cases such as that at bar, damages have not been generally substituted for injunctions in accordance with

the Restatement of Torts, § 757, Comment d, quoted supra.

22. That case was brought in the federal court in New York, with jurisdiction based on diversity of citizenship. The court did not discuss any New York authorities. If my colleagues' opinion in the instant case is correct, then, if it were the rule in New York that a temporary injunction would always issue in such a case, the decision in the Foundry Services case would have been wrong.

is not at all inconsistent with the notion that equity is always flexible.

passing it through a stove, and for all ordinary purposes it is sufficient if it be

Appendix

*The expired patent*:
"UNITED STATES PATENT OFFICE.
"HENRY CASEVITZ, OF PARIS, FRANCE.
"HYGIENIC TEXTILE SPONGE.

"1,074,245.    Specifications of Letters Patent.    Patented
Serial No.    Sept. 30,
"Application filed June 25, 1913.    *775,732*        1913.

"*To all whom it may concern:*

"Be it known that I, Henry Casevitz, a citizen of the Republic of France, residing in Paris, France, have intended a new and useful Improvement in Hygienic Textile Sponges, which invention is fully set forth in the following specification.

"The object of the present invention is a hygienic and perfumed sponge of textile material.

"The use of sponges for toilet purposes is contrary to all hygienic and antiseptic precepts. Subjected, in fact, to the simultaneous action of heat and moisture, the microbes that the sponges contain are placed under the most favorable conditions for their development just as they would be in a culture designed for such purpose. To remedy these drawbacks the applicant proposes to replace the ordinary sponge by a woolen material or a little ball of absorbent cotton, which would be only used once in a toilet operation and can be thrown away on account of its small cost. It is convenient to incorporate in this cloth or in the small cotton ball a perfumed antiseptic substance, mixed preferably with a soap-like product so that when the cotton is thrown into cold or tepid water, that is used for the toilet, a liquid is formed pleasant to the skin and consistent with hygienic principles. It is not indispensable to incorporate in the sponge an antiseptic product to give it the desired hygienic qualities. The sponge in question can be rendered antiseptic by simply

manufactured with care and cleanliness without the necessity for placing it in a liquid really antiseptic or aseptic. Moreover, the preparation and the compression of the sponge can be attained either by pressure by means of some suitable press or by blows. To impart to the cotton a form more suitable for sale, and transport, it is convenient to compress it by means of a hydraulic or other press to obtain thus small packets of a useful shape, which, placed in water, will rapidly and easily regain their original size.

"In the accompanying drawings:

"Figures 1, 2, and 3 are views illustrative of successive steps in the formation of the hygienic sponge of this invention; Figs. 4 and 5 illustrate the swelling of the sponge of Fig. 3 when saturated with water.

"In forming my hygienic sponge of cotton for example, I preferably take a piece of hydrophil cotton of rectangular form, Fig. 1, and give it a double fold as shown in Fig. 2. The piece of cotton thus folded is then placed in a tubular matrix and subjected to pressure, by a piston working in the cylinder, sufficient to compress the cotton to the form of a circular disk or cylinder as shown in Fig. 3. The sponge or sponges thus formed may be packed in cases or cartons or wrapped in paper. Each disk constitutes a sponge intended for toilet use. When in using such a sponge it is plunged into water; it rapidly lengthens to approximately the form shown in Fig. 4, and then further swells and spreads to the

form shown in Fig. 5, to a volume which may be approximately twenty times the volume of the compressed disk.

"What is claimed is:

"1. A hygienic sponge made of a sheet or layer of unwoven fibers folded upon itself and highly compressed endwise to the form of a compact wad or disk adapted when saturated with liquid to expand to many times its compressed volume and to unfold to a sheet or layer form.

"2. A hygienic sponge made of a sheet or 85 layer of absorbent cotton folded upon itself and highly compressed endwise to the form of a compact wad or disk adapted when saturated with liquid to expand to many times its compressed volume and to unfold to a sheet or layer form.

"In testimony whereof I have signed this specification in the presence of two subscribing witnesses.

"Henry Casevitz

"Witnesses:
  "Lucien Memminger,
  "Gabriel Belliard."

Defendants offered this patent in evidence. The trial judge excluded it. Plaintiffs, answering defendants' contention on this appeal that the exclusion was error, assert that the testimony of one of plaintiffs showed that non-secret processes, like that disclosed by the patent, were in use before plaintiffs continued their minor improvements. Nevertheless, the patent should have been received in evidence. As it is in the record, it is proper for this court to consider it on this appeal.