EXTRIN FOODS, INC., Plaintiff, v. HERMAN LEIGHTON et al., Defendants.

Supreme Court, Special Term, Kings County, May 28, 1952.

*Henry Kroll* for plaintiff.

*Benjamin Glass* for defendants.

HART, J.   Plaintiff here seeks an injunction restraining defendants from manufacturing and distributing certain flavoring products with the use of alleged secret formulae and processes claimed to be plaintiff's property, and from aiding anyone in the manufacture and distribution of these products.   The prayer for relief requests that defendants be also enjoined from imitating plaintiff's " seal, script, layout, trade names, claims or simulations thereof."   Plaintiff as incidental relief seeks an accounting of profits and to recover damages.

The court finds the facts established by the proof as follows: Plaintiff corporation was organized in 1942 as successor to a partnership created in 1938 and known as Extrin Laboratories. The partners were individuals named Kugelman, Fontana and Sweet.   Kugelman had developed formulae and processes for synthetizing a butter flavor to be imparted primarily to baked goods and confectioneries.   These formulae and processes were assigned by the partnership to plaintiff.   Defendant Ciconte had been hired by plaintiff in 1943 as an errand boy and general helper.   He eventually became the production manager.   Defendant Leighton was hired as a chemist in 1946 to establish a laboratory for plaintiff.   His duties included the mixing of the flavoring ingredients, improving existing products and the development of new ones.   Under the practice existing in the plaintiff organization the flavoring ingredients were prepared by the chemist in a part of the building separate from the production room where they finally were blended with other ingredients into the finished product.

The original Extrin product was in the form of a powder. Prior to Leighton's employment Kugelman had prepared a formula of the ingredients for the butter flavor in paste form which bears the trade-mark " Extrin-AA."

One of the most important assignments given to Leighton by plaintiff was the development of a product containing the butter flavor in the form of a free flowing fluid.   As the result of many months' experimentation and research by Leighton under the supervision and with the assistance of Kugelman a formulation of an emulsion was developed.   The process of manufacture was established in the production room by Leigh-

ton and Kugelman with the assistance of Fontana and defendant Ciconte. The resulting product became known as Extrin's " Creme Royale."

Basically the " Creme Royale " and the paste " Extrin-AA " in regard to the flavoring elements are the same with respect to their ingredients which vary quantitively in the paste and the emulsion. The ingredients required to establish the flavor were blended together by the chemist pursuant to the formula developed by Kugelman and is referred to as the " K Special." The chief difference between the paste and emulsion is the medium by which the flavor is carried. Defendant Leighton helped to a great extent, after exhaustive experiments at plaintiff's expense to develop the emulsion. He claims that he also improved the " K Special." He prepared for plaintiff a Madeira flavor under the trade name of " Revelex." Ciconte was given the formulae for the blending of each product but not the " K Special." It therefore appears that Ciconte and Leighton thus in their respective capacities learned and knew the ingredients and the quantities and methods of production of each of plaintiff's products, including the flavoring elements.

In 1949 or 1950, the original founders of plaintiff corporation fell out among themselves. Litigation ensued. As a result Fontana and Kugelman sold their interests and Sweet alone remained. Fontana went into business as Nutrin Laboratories.

On September 18, 1950, defendants Leighton and Ciconte left plaintiff's employ and became associated with Nutrin. Within a month thereafter they became sole stockholders and directors of Nutrin Foods, Inc., and Fontana severed his connection with the corporation. In the interim, within a few weeks after terminating their employment with plaintiff, defendants were producing competitive products. Defendant Leighton, when he terminated his employment with plaintiff, appropriated about one hundred fifty cards which showed the results of various baking tests. Though at first denying that he had misappropriated them, they were subsequently returned to plaintiff through defendant's counsel. At the time of the commencement of business by defendant, Nutrin Foods, Inc., simulated plaintiff's trade-mark and labeling. After the instant action was commenced, so as to avoid the charge of imitation of plaintiff's trade-mark and label, defendants changed theirs. The defendant corporation was reorganized and the name changed to Nutrol Laboratories, Inc.

Upon the trial it was agreed by the parties that Nutrol Laboratories, Inc., be joined as a defendant to the action; that defendants' counsel appear for it and adopt on its behalf the answer interposed by the defendants. The judgment to be entered herein is to direct that the title be amended accordingly.

The preponderating evidence satisfies the court that the defendants' emulsion is substantially the same as plaintiff's " Creme Royale ". Defendants concede that the ingredients of their product are substantially the same as plaintiff's, though they claim that the products themselves were different since the flavoring ingredients differ. Defendants claim their product is dissimilar since their flavoring is based on butter derivatives (esters and organic acids purchased commercially) whereas plaintiff's main flavoring ingredient is diaceytil. A chemical analysis by a competent chemist establishes that the products are substantially identical chemically and in taste, odor, appearance and consistency. From the court's own observation the products are substantially identical as to color, odor and consistency. Plaintiff established upon the trial that Ciconte, as president of defendant corporation, shortly after the commencement of business, wrote to a former salesman of plaintiff, offering him employment and representing that defendants manufactured the same product. Two of plaintiff's customers testified (and were not contradicted) that Leighton, in soliciting their business, told them that he had been Extrin's former chemist and was manufacturing exactly the same products as Extrin. All of the foregoing satisfies the court that with regard to the "Creme Royale," defendants' emulsion is substantially identical. With respect to the paste, however, plaintiff failed to prove the similarity of their products or their ingredients.

The issues upon the trial were by agreement of the parties limited to (1) whether plaintiff's formulae and processes were secret and whether they were appropriated wrongfully by defendants and (2) whether plaintiff was applying for equitable relief with " clean hands ".

(1) As between the parties, are the formulae and processes secret? If so were they unlawfully appropriated by defendants?

In resolving this issue the court is first required to define the term " secret " as applied to a formula. The term " trade secret " is defined in the Restatement of Torts (§ 757, p. 5) as follows: " b. *Definition of trade secret.* A trade secret may consist of any formula, pattern, device or compilation of in-

formation which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. * * * A trade secret is a process or device for continuous use in the operation of the business. Generally it relates to the production of goods, as, for example, a machine or formula for the production of an article." (See, also, 1 Nims on Unfair Competition and Trade-Marks [4th ed.], p. 403; *Kaumagraph Co.* v. *Stampagraph Co.*, 235 N. Y. 1, 7, and *Fairchild Engine & Airplane Corp.* v. *Cox*, 50 N. Y. S. 2d 643, 656.)

The mere fact that the constituent ingredients of plaintiff's product are on its label does not preclude the existence of secret formulae. As expressed by plaintiff's expert:

" THE WITNESS: I would call both of them or either of them a product resulting from a secret formula for the reason that while ingredients are declared on the label, the proportions in which they are present and the method of compounding the product is not revealed either on the label or is it revealed in any standard or any definition which applies to such products.

" THE COURT: In other words, among chemists a formula is still secret even though the component parts are known if the method of preparation is not known and may only be ascertained as a result of experimentation; is that correct?

" THE WITNESS: That is correct."

Nor is it of great moment that plaintiff's formula can be revealed after examination of its labels, experimentation and analysis by a competent chemist. As expressed in *Schavoir* v. *American Re-bonded Leather Co.* (104 Conn. 472, 476) in an action against one violating a secret given in confidence, the court stated: " But this does not mean that the possibility of its discovery, by chemical analysis or experimentation, will itself put an end to the rights of the originator, and so long as the method of its production remains a secret, the law is not much concerned with its nature or the elements which go to make up the composition." Further authority for this conclusion may be found in the opinion in *Tabor* v. *Hoffman* (118 N. Y. 30, 36): " But, because this discovery may be possible by fair means, it would not justify a discovery by unfair means, such as the bribery of a clerk, who in course of his employment had aided in compounding the medicine, and had thus become familiar with the formula. The courts have frequently

restrained persons, who have learned a secret formula for compounding medicines, beverages and the like while in the employment of the proprietor, from using it themselves or imparting it to others to his injury ".

Even though the contract of hiring contained no express covenant, the individual defendants by an implied agreement bound themselves not to disclose, reveal or appropriate secret processes or formulae. (See Nims, *supra,* p. 423, citing *Witherow Steel Corp.* v. *Donner Steel Co.,* 31 F. 2d 157, and *Witkop & Holmes Co.* v. *Boyce,* 61 Misc. 126, affd. 131 App. Div. 922. See cases collated at 61 Misc. 131.) Liability under these circumstances is predicated on the breach of this duty rather than on a specific property right of plaintiff (Restatement, Torts, § 757, p. 4). From the welter of decisional authorities sustaining this view, allusion may be made to *Vulcan Detinning Co.* v. *American Can Co.* (72 N. J. Eq. 387, 395–396): "Looking now a little more closely at the nature of the relief called for by the complainant's case, which we are not enabled to do in the light of the issues that have been actually tried, we shall see, I think, that too much emphasis has perhaps been placed upon the element of absolute secrecy in the process, and that not enough stress has been laid upon the inequitable character of the defendants' conduct in making a use of such process that was inimical to the complainant's interests." And at page 397: " The conclusion to which the foregoing considerations lead is that entirely aside from the technical secrecy of the process or the abstract question of property therein, the complainant is entitled to have its trustee, his associates and their servants restrained from using against the interests of the complainant the very process with which its trustee was intrusted for its benefit."

In an action such as this, to enjoin the use of a formula claimed to be a secret, communicated in confidence, the important issue of fact is not whether it is new or could have been discovered by defendants by fair means but whether the parties dealt at arm's length and whether their negotiations were of such character as to put defendants in a position whereby they are bound to respect the information given to them by plaintiff and not to use it for their own benefit (1 Nims on Unfair Competition and Trade-Marks [4th ed.], § 143a, citing *Allen-Qualley Co.* v. *Shellmar Products Co.,* 31 F. 2d 293, affd. 36 F. 2d 623). In the *Allen-Qualley* case the court stated (p. 297): " It may well be that if defendant had never been in a confidential relationship with the plaintiff, upon the plaintiff's publication to

the world of its wrap, the defendant might rightfully have purchased the same. Not by any action of plaintiff, but by its own violation of confidence, it has deprived itself of that opportunity, which is open to the rest of the world. It cannot obtain in confidence the details of an alleged invention, of the process for making the same, and of the machine by which it is made, and proceed to make the product by that or similar process, or by equivalent or similar machine or methods before the plaintiff makes its publication to the world, and then assert that it is a member of the public to whom the publication has been made. A court of equity cannot approve such breach of confidence." (See, also, *Du Pont Powder Co.* v. *Masland,* 244 U. S. 100, 102.)

Applying the foregoing principles of equity to the action at bar, the court is satisfied that as between the parties the individual defendants were informed in confidence of the formulae for the emulsion and its flavoring ingredients known as "K Special," both of which were used in the preparation of plaintiff's " Creme Royale", and that defendants appropriated them to their own use. This is evident from the fact that plaintiff's and defendants' products are the only ones (with the exception of " Sto-chard ") on the market in the form of an emulsion containing added " cultures ". The suggestion is advanced by plaintiff that " Sto-chard " too, is the result of a piracy of its secret formulae by former associates. Whether this is true or false is of no moment in this litigation. Even if " Sto-chard " were the product of independent investigation and experimentation the fact remains that defendants' emulsion is the result of the misappropriation of plaintiff's formula by defendants and is not the product of defendants' research. These formulae were not generally known to competitors in the field. The fact that months of experimentation by Leighton were required before " Creme Royale " was evolved belies the present claim that the formula is not secret. Since the defendants were able immediately to produce their emulsion which is substantially identical in chemical and physical properties with plaintiff's, it is apparent that plaintiff's formulae were used by defendants for their own interests hostile to plaintiff. In fact Ciconte admitted that he used the same ingredients and followed the same formula for making defendants' emulsion as Leighton instructed him to use at Extrin.

The mere fact that Leighton may have made some changes in the formula and flavoring ingredients as he claims does not affect the conclusion reached. Quoted in *Fairchild Engine & Airplane Co.* v. *Cox* (50 N. Y. S. 2d 643, 659, *supra*) is the fol-

lowing language from the Restatement of Torts (Vol. IV, § 757, p. 9): " *Modification or improvement of the secret by the actor.* To subject a person to liability, under the rule stated in this Section, for the use of another's trade secret, there is no requirement that he use it in exactly the form in which he received it. He may be liable even if he uses it with modifications or improvements upon it effected by his own efforts. Differences in detail do not preclude liability if, substantially, the process used by the actor is derived from the other's secret in the manner stated in this Section."

The fact remains that the chemical and physical properties of defendants' emulsion are substantially identical with plaintiff's " Creme Royale " and the conclusion is inescapable that both are the result of plaintiff's formulae.

It would seem that even the similarity of the appearance of the respective products would be sufficient to sustain the charge of unfair competition under the circumstances here developed. (Cf. *Thal* v. *Polumbaum,* 303 N. Y. 686, modfg. 277 App. Div. 1115 which affd. 196 Misc. 897.)

The court finds that the formula for the " Creme Royale " was a trade secret within the meaning of section 757 of the Restatement and the authorities above cited, and preserved as such by plaintiff. Defendants were aware of its secret character. These findings apply also to the flavoring formula known as " K Special ". As heretofore noted, though " K Special " is used in both the paste and the emulsion, there is no proof in the record that defendants' paste product is the same as plaintiff's or that defendants employed the " K Special " in the Nutrol paste. Likewise this proof is lacking with respect to the other competitive products of the parties.

(2) Is plaintiff before this court of equity with " unclean hands "?

This defense is predicated on a claim that plaintiff has been and presently is violating the Federal Food, Drug, and Cosmetic Act (U. S. Code, tit. 21, § 301 *et seq.*) and is misrepresenting its products. Plaintiff conceded upon the trial that the labels on the jars in which " Creme Royale " are sold failed to disclose the presence of the component parts of the flavoring ingredients comprising " K Special ". Defendants contend that plaintiff is therefore violating subdivision (k) of section 403 of the Federal Act (U. S. Code, tit. 21, § 342, subd. [k]) which provides that: " A food shall be deemed to be misbranded— * * * (k) If it bears or contains any artificial flavoring, artificial coloring, or chemical preservative, unless it bears labeling

stating that fact ". Since plaintiff's product is processed by bakers and confectioners plaintiff counters by referring the court to section 405 of the statute (U. S. Code, tit. 51, § 345, as amd. which provides: " The [Administrator] shall promulgate regulations exempting from any labeling requirement of this Act * * * (2) food which is, in accordance with the practice of the trade, to be processed, labeled, or repacked in substantial quantities at establishments other than those where originally processed or packed, on condition that such food is not adulterated or misbranded under the provisions of this Act upon removal from such processing, labeling, or repacking establishment."

Whether the Administrator has in fact promulgated such regulations of exemptions insofar as they may affect plaintiff's products, has not been made to appear. The evidence, however, does disclose that in May, 1946, a notice of hearing was served on plaintiff by the Federal Food and Drug Administration charging violations of the law in that the product (paste — the emulsion not being then in existence) was adulterated and misbranded. With respect to the misbranding the specifications charged plaintiff with falsely referring to its products as a " culture " and with violating subdivision (k) of section 403, in that " It contains artificial flavoring and fails to bear labeling stating that fact ". The matter before the Food Administrator was adjusted by an agreement to eliminate the description of the product as a culture. Apparently the other charges with respect to adulteration and mislabeling and the nondisclosure of the flavoring elements were withdrawn. No proof was offered by defendants that any component parts of the flavoring agent described as " Special K " which plaintiff has omitted from its labels are deleterious or harmful to the consuming public.

In connection with its advertising prior to the action taken in 1946 by the Federal Food Administrator, plaintiff had held out that its product was natural — that it was a bacteriological culture.

Defendants have failed to sustain the burden of proof that plaintiff is presently materially misrepresenting its product. The gist of plaintiff's present advertising is that to baked goods its products impart a natural butter flavor. It has not been established that this representation is false. " The plaintiff's position must be judged by the facts as they were when the suit was begun, not by the facts of a different condition

and an earlier time '' (*Coca-Cola Co.* v. *Koke Co.*, 254 U. S. 143, 147).

Moreover, even if it would appear that plaintiff were guilty of the mislabeling and misrepresentation charged to plaintiff by defendants, its right to recover is not of necessity barred by the doctrine of '' unclean hands ''. Though there is some authority to the contrary, (2 Nims on Unfair Competition and Trade-Marks [4th ed.], §§ 390, 395; 2 Pomeroy's Equity Jurisprudence [5th ed.], § 402b), there is a legion of authorities holding that the maxim applies only when plaintiff's conduct is inequitable with respect to the subject of the action between the parties. As expressed by Pomeroy (Vol. 2, § 399, p. 99): '' *Necessity for injury to complainant.*— The party to a suit, complaining that his opponent is in court with ' unclean hands ' because of the latter's conduct in the transaction out of which the litigation arose, or with which it is connected, must show that he himself has been injured by such conduct, to justify the application of the principle to the case ''.

The apt language of HOLMES, J., culled by Nims from *Coca-Cola Co.* v. *Koke Co.* (254 U. S. 143, 145, *supra*) bears repetition that: '' Of course a man is not to be protected in the use of a device the very purpose and effect of which is to swindle the public. But the defects of a plaintiff do not offer a very broad ground for allowing another to swindle him. The defense relied on here should be scrutinized with a critical eye.''

In the case of *Rabinowitz & Co.* v. *Dasher* (82 N. Y. S. 2d 431) in an action against a former employee, the court in dealing with the defense of unclean hands stated at page 441: '' While under the doctrine of ' unclean hands ' relief may be denied in equity because of a plaintiff's own inequitable conduct, that conduct must relate in some way to the subject matter in litigation or to the relations between the parties in suit. ' A court of equity is not an avenger of wrongs committed at large by those who resort to it for relief.' (Pomeroy on Equity Jurisprudence, 5th Ed., Sec. 399.) ''

In *Molina* v. *Barany* (56 N. Y. S. 2d 124) in an action to enjoin a former salesman from acts of unfair competition, the court stated at page 133: '' The evidence falls short of sustaining the seventh defense, and, in addition, the acts of the plaintiffs complained of are not related to the subject matter of this controversy. * * * The court, however, does not condone the sharp business practices of the parties as demonstrated by Plaintiffs' Exhibit 30, or the false and misleading statements which abound in the advertising matter sponsored

by plaintiffs or their practice in furnishing samples of a better grade than the tools subsequently delivered on order."

Similar to the instant action is the case of *Germo Mfg. Co. of Missouri* v. *McClellan* (107 Cal. App. 532) where an action had been brought to enjoin former employees from using secret formulae claimed to be plaintiff's property, which was dismissed by the trial court on the ground of plaintiff's unclean hands. The appellate court, in reversing the judgment, held that acts and conduct of the plaintiff which did not measure up to the " moral code of square dealing " (p. 545) such as the mislabeling of plaintiff's products, and other improprieties of the plaintiffs, had nothing to do with the " matter in litigation." (See, also, *Mindlin* v. *Grissman*, 137 Misc. 838; *Smiling Irishman* v. *McDonald*, 183 Misc. 985; *World's Dispensary Medical Assn.* v. *Pierce*, 203 N. Y. 419, and *American Safety Razor Corp.* v. *International Safety Razor Corp.*, 34 F. 2d 445.)

Moreover, were the facts alleged by the affirmative defense established, this court would be inclined to accept the suggestion of Mr. Nims and grant plaintiff the relief requested conditioned on its " cleansing of its hands " rather than bar the relief outright or without prejudice to renewal after its alleged " misbranding and misrepresentations " were terminated. The public would thereby be protected and defendants would not be permitted to profit by their own misconduct. (See Nims, *supra*, p. 1225, *et seq.*) The proof, however, fails factually to sustain the allegations of the defense.

The court concludes that plaintiff is entitled to judgment restraining defendants from divulging or using plaintiff's formulae for the " K Special " or " Creme Royale " as prayed for in the complaint. Defendants will also be required to account for the profits earned from the manufacture, sale and distribution of the emulsion prepared by it in emulation of the " Creme Royale " and for the damages sustained by plaintiff for the wrongful misappropriation of the formula of the " Creme Royale ".

As to defendant Ciconte, his liability, as a joint tort-feasor for defendants' profits and plaintiff's damages is limited to the date on which he terminated his relationship with defendant corporation. Plaintiff is also allowed the costs of this action. Settle on notice interlocutory judgment providing for the appointment of a referee to ascertain and determine plaintiff's damages and the profits enuring to defendants from the manufacture, distribution and sale of the product made by it in the emulsion form (Nutrin and Nutrol).