Arthur D. Brennan, J,
This action was instituted by the plaintiff for injunctive relief and damages upon the ground that the defendants allegedly misappropriated and utilized processing methods of the plaintiff. The plaintiff contends that the defendants, Shalita and Cohen, acting on behalf of themselves as well as the defendant corporations, inveigled the defendant, Beyer, a former employee of the plaintiff, to breach his contract with the plaintiff and to disclose its trade secrets.
The plaintiff, hereinafter also referred to as “ 3M ”, is a Delaware corporation licensed to do business in the State of New York, and for the past 30 years has conducted a substantial and profitable business of manufacturing and selling, among other things, pressure-sensitive adhesive tape under the trade *672 mark, “Scotch”. Insofar as this action is concerned, there are two types of tape involved — one known as the crepe paper-backed pressure-sensitive masking tape which will hereinafter he referred to as “ masking tape ”, and the other is a transparent cellophane-backed pressure-sensitive adhesive tape, hereinafter referred to as “ cellophane tape 5 ’.
The defendant, Technical Tape Corp., hereinafter referred to as “ Technical Tape ”, is a New York corporation and since 1948 has been manufacturing and selling a masking tape; since the Fall of 1951 it also has been manufacturing and selling a cellophane tape. Both tapes have been sold under the trade name of “ Tuck”. The defendant, Vernon Chemical & Manufacturing Corp., hereinafter referred to as “Vernon”, is a New York corporation engaged since 1951 solely in the business of selling masking tape and cellophane tape manufactured by Technical Tape, and which tapes it has sold under the trade name, “ Black Wizzard ”. The fair inference to be drawn from the testimony is that “ Vernon ” was dominated by the defendant, Cohen. Said defendant, Cohen, founded Technical Tape in 1947 and since that time he has been the principal stockholder, a director, and the chief executive thereof. The defendant, Shalita, was the first employee of Technical Tape and since 1951 he has been and still is a vice-president of that company. From approximately 1943 through 1947, he was associated, as technical director, with a firm known as the Cofax Company which manufactured and sold pressure-sensitive adhesive cellophane tape.
The defendant, Beyer, was employed by the plaintiff from June 25, 1945 to May 25, 1951, first at the manufacturing plant of the plaintiff in St. Paul, Minnesota, and thereafter at its plant in Bristol, Pennsylvania. In 1930 this defendant was graduated from the University of Minnesota with the degree of Bachelor of Science in chemical engineering and two years later he received his Master’s Degree. Thereafter he was employed, as a chemist, by the Minnesota & Ontario Paper Company and by the Insulite Company, until the Spring of 1945 when he entered the employ of the plaintiff. At both of the plaintiff’s aforesaid plants Beyer’s duties included research in and development of particular kinds of pressure-sensitive adhesive tape (including especially masking tape) as well as quality control of the production of cellophane tape and masking tape.
As the result of the work of one Richard Gurley Drew, who entered the employ of the plaintiff in 1921, the basic masking tape patent (U. S. Pat. No. 1,760,820) was issued to the plaintiff *673 on Drew’s application on May 27,1930 and the basic cellophane tape patent (U. S. Pat. No. 2,177,627) was issued to the plaintiff on Drew’s application on October 31, 1939. Since the beginning of the plaintiff’s operations in the pressure-sensitive tape field, it has expended large sums in research and development for the purposes of enhancing the quality, life and performance characteristics of its tapes; and in the years from 1934 to 1945 the plaintiff expended for such purposes approximately $3,500,000, most of which was for the improvement of cellophane and masking tape.
From the beginning of the plaintiff’s operations in the pressure-sensitive tape field, to and including May 25, 1951, the plaintiff developed certain manufacturing standards, formulations, techniques and processes, and special machinery and equipment used in connection therewith (with respect to masking tape and cellophane tape) which, during said period, were not disclosed to the public by plaintiff in patents or otherwise, and which were of value to the plaintiff. Every reasonable precaution was taken by plaintiff to insure that the said manufacturing standards, formulations, techniques, processes, and the special machinery and equipment used in connection therewith, would not be disclosed or described to any person who, by virtue of the nature of his employment with the plaintiff, was not entitled to have knowledge thereof; and one of said precautionary means was to require all technical employees whose duties would require them to have knowledge of some or all of plaintiff’s processes to execute a form of agreement, hereinafter referred to as the “ Technical Agreement ”, which, among other things, bound said employees not to disclose or divulge any of plaintiff’s processes to anyone without plaintiff’s prior written consent. This “ Technical Agreement” also provided that any such employee, upon leaving the employ of the plaintiff, would not enter the employment of any competitor for a period of one year. The defendant, Beyer, signed such an agreement. The plaintiff maintained its secret processes in so-called “ Standard Books ”, the distribution and use of which was limited to employees whose duties required them to have knowledge of plaintiff’s processes; said books were so constructed and written (by the use of code symbols and otherwise) as not to be intelligible and comprehensible, in particular portions thereof, to a person not having access to an entire set of the standards, and it was plaintiff’s general policy and practice not to disclose its manufacturing processes and formulations or its technological “ know-how ” to other persons or companies, even companies holding licenses under plaintiff’s tape patents.
*674 The defendant, Beyer, who was a trained and qualified chemist while working at plaintiff’s tape laboratory in St. Paul, had access to a complete set of manufacturing standards of the plaintiff as well as to those production areas in plaintiff’s factory where the manufacture of masking tape and cellophane tape was carried out. Said defendant’s duties, while working in the tape laboratory in St. Paul, included experiments on, among other things, various types of saturants used on masking tape as well as the so-called “ alkabize backsize process ” for masking tape. Prior to his transfer to the plaintiff’s plant in Bristol, Pennsylvania, said defendant was well instructed in the plaintiff’s quality control procedures with respect to the manufacture of both masking tape and cellophane tape. In early 1949 the plaintiff promoted the defendant, Beyer, to the position of assistant supervisor of quality control at the plaintiff’s Bristol plant wherein masking tape and cellophane tape were being manufactured and it was his responsibility as well as the responsibility of other supervisors to insure against the improper disclosure of any of the manufacturing information set forth in plaintiff’s standards books. Beyer’s duties required him to have a familiarity with all of plaintiff’s manufacturing standards and each phase of the manufacturing operation pertaining to the aforesaid tapes. Said defendant learned and became fully familiar with or was in a position to become fully familiar with the details of the plaintiff’s alleged trade secrets as described in plaintiff’s proposed supplemental findings of fact.
When Technical Tape began the manufacture of masking tape in 1948, it became a competitor of the plaintiff and said tape was offered to the trade at a price at least 5% below the price of plaintiff’s masking tape. This masking tape, as produced by Technical Tape during the first two years of its manufacturing operations, was not of good quality and the same exhibited such defects as buckling, gapping, fluting, and other forms of roll distortion which were the result of defective formulations or manufacturing procedures. In 1949, attempts by Technical Tape to compound its own saturant for masking tape backing failed, and the company had to return to the use of the services of an outside supplier for its saturant. As a result of these and other manufacturing problems, the defendant, Cohen, instructed one, Laux, who was a sales employee of Technical Tape, to advertise in newspapers in the Minneapolis-St. Paul area in the hope that said advertisements would there attract technical employees of the plaintiff who might be interested in becoming employed by Technical Tape. The advertisements *675 did not reveal that they were inserted at the request or the instructions of Technical Tape itself. In August of 1949 Cohen instructed Laux to communicate with one George B. Barrett, then employed by plaintiff in its tape laboratory in St. Paul, with a view to the latter’s possible employment by Technical Tape. Thereupon, Laux brought Barrett and his wife to New York for an interview with Cohen, the Barretts’ traveling expenses being paid by Technical Tape. Prior to seeing Cohen, Barrett was told by Laux of the manufacturing problems of Technical Tape and, in addition, it appears that prior to said interview, Barrett was taken to Laux’ home .where Laux exhibited the masking tape manufactured by Technical Tape which showed peaking and gapping. Thereafter, during a talk with Cohen, Barrett informed Cohen of the existence of Barrett’s “Technical Agreement” which forbade him from accepting employment with a eompetitior of plaintiff within one year from leaving plaintiff’s employ. Barrett also advised Cohen as follows: “We all signed an agreement that we will not work for a competitive company”; and he further stated, “I wouldn’t want to get into trouble because of that ”. It appears that Barrett was unwilling to accept employment by Technical Tape and Cohen then requested the names of other employees who might be helpful to Technical Tape. In response to such request, Barrett gave Cohen the names of the defendant, Fred Beyer, and one Ed Lunsted; and at the same time, Barrett stated that these two men were far more experienced than he (Barrett) and that he understood the first of the men was outstandingly good. On August 23, 1949, Cohen wrote Laux a memorandum in which he advised Laux that Barrett had not been employed but added that Barrett had suggested Fred Beyer, as a person outstandingly good, to help with the problems which Technical Tape was experiencing. Although this memorandum instructed Laux to communicate with Beyer, Cohen later countermanded these instructions, but renewed them in March of 1951 whereupon Laux called upon the defendant, Beyer, and arranged for him to be interviewed by Cohen at the latter’s home in New Rochelle. At said interview held in March of 1951 Cohen asked Beyer if he could bring information as to plaintiff’s manufacturing processes and formulations, and Beyer stated that he could do so; and it is clear that Beyer felt that the furnishing of said information was a condition for his obtaining employment with Technical Tape. Beyer was also offered a salary in excess of that being paid him by the plaintiff. Thereafter it was agreed between Beyer and Cohen that Beyer would accept employment by Technical Tape but that he, Beyer, would stay *676 on in plaintiff’s employ until he had obtained certain manufacturing information desired by Technical Tape. While still in the employ of plaintiff, Beyer attended a meeting on a Saturday morning in late March or early in April of 1951 in the Technical Tape plant in the County of Bronx, N. Y., at which he discussed with Cohen, Shalita and others, the technology of tape manufacturing and some of the methods, equipment, techniques and processes employed by the plaintiff. On this occasion, Beyer was taken by Cohen and Shalita through the Technical Tape plant and on the same occasion Beyer was given a memorandum or list by Shalita, in his handwriting, of “ 3M Questions ” containing requests for information regarding different types of masking tapes manufactured by plaintiff and also regarding tile cement. Beyer thereafter supplied Shalita with the answers to these questions. While still in the employ of plaintiff, and with the knowledge and at the request of Cohen and others connected with Technical Tape, Beyer copied out of plaintiff’s standards books some 10 formulations of chemical compounds used by the plaintiff in the manufacture of masking tape, and thereafter delivered said formulations to Technical Tape. Beyer also supplied information as to “ 3M’s ” filtering-coating process, the latter being described in the plaintiff’s proposed supplemental findings of fact. Beyer’s starting employment date with Technical Tape was May 28, 1951 and to prevent plaintiff from learning that Beyer had accepted said employment, Cohen suggested to Beyer that he falsely inform plaintiff that he was going to work for a firm known as Lloyd Paper Company, but which firm was not actively engaged in business. Beyer did so inform plaintiff, and as a result, no one in plaintiff’s employ learned that Beyer was working for Technical Tape until September, 1952. During the first year of Beyer’s employment with Technical Tape, his salary was at least 33% in excess of the salary which he received during the last year of his employment with plaintiff. Beyer continued in the employ of Technical Tape until September, 1955 when he was first suspended and he was thereafter discharged on February 11, 1956.
A few months after the employment of Beyer, Technical Tape manufactured the “ Tuck ” No. 120 masking tape which was a substantial improvement over other masking tapes theretofore manufactured by Technical Tape. This new tape received commercial acceptance and was hailed by Cohen as “ our biggest, most important and profitable contribution to the tape field.” It is this court’s view and finding, based upon the evidence adduced, that the information supplied by Beyer to Technical *677 Tape consisting of those trade secrets of the plaintiff relating to masking tape, as set forth in the plaintiff’s proposed supplemental findings of fact, resulted in the prompt improvement and subsequent commercial success of the “ Tuck ” No. 120 masking tape as well as in the like improvement and success of other masking tapes manufactured by Technical Tape, all of which were sold in competition with the “ Scotch ” brand masking tapes manufactured by the plaintiff.
Subsequent to April 1,1951, and within nine months after the start of Beyer’s employment by Technical Tape, Technical Tape began the regular commercial production and sale of cellophane tape. While it is true that Shalita, prior to Beyer’s employment by Technical Tape, had been working in the latter’s laboratory on experiments in connection with cellophane tape, he discontinued such experiments at- or about the time of Beyer’s employment. It is also true that prior to 1948, Shalita had been engaged in experimenting in the production of cellophane tape while employed by the afore-mentioned firm known as the Cofax Corporation, yet it is clear that to compete successfully in the manufacture and sale of cellophane tape, it was incumbent upon Technical Tape to produce a cellophane tape of better quality than the tape theretofore produced by the said Cofax Corporation during the period of Shalita’s employment by that company. It also clearly appears that Technical Tape did not produce a commercially acceptable cellophane tape until after Beyer’s employment by that company. Here, too, it is this court’s view and finding, based upon the evidence adduced, that the information supplied by Beyer to Technical Tape consisting of those trade secrets of the plaintiff relating to cellophane tape, as set forth in the plaintiff’s proposed supplemental findings of fact, resulted in the satisfactory performance and commercial success of the cellophane tape manufactured by Technical Tape and sold by it in competition with the 6 ‘ Scotch ’ ’ brand of cellophane tape manufactured by the plaintiff. In fact, on May 23, 1952, Technical Tape announced that “ Our cellophane tape is doing a tremendous job and we expect it to be one of the biggest items in our line.” Further, it clearly appears that there was a rapid increase in the volume of sales of all pressure-sensitive adhesive tapes manufactured by Technical Tape during each of the years following its employment of Beyer.
This court finds that Technical Tape’s employment of Beyer was arranged for the specific purpose of having him divulge confidential information which he possessed or could readily ascertain by reference to the plaintiff’s standards books with respect to the manufacture of masking tape and cellophane *678 tape and which information he acquired or could acquire in the course of his employment by the plaintiff. From the record before this court, it is clear that the action of Technical Tape and those who aided it was wrongful. Cohen and Shalita both knew that Beyér was under a written obligation not to divulge the confidential information and trade secrets which he acquired in the course of his employment with the plaintiff or could acquire in the course of such employment. It is apparent that Beyer was willing to be and was knowingly placed by Technical Tape in a position of performing services wherein, by resorting to and disclosing the use of that which he had learned or could learn while in the plaintiff’s confidence and employ, he could make such a major contribution to the pressure-sensitive tape products of the aforesaid defendant so as to enable said products to compete favorably with those of the plaintiff.
In the light of the foregoing determinations, the remaining issues to be decided are: whether the plaintiff possessed trade secrets which were appropriated wrongfully and used by the defendants; whether the defendants have established those two affirmative defenses alleged in their answers which have not been stricken therefrom; and if the aforesaid issues be resolved in plaintiff’s favor, the nature and extent of the relief to which the plaintiff is entitled.
In order to meet the burden cast upon it, it was necessary for the plaintiff to establish by a fair preponderance of the credible evidence, that the particular trade secrets which it claimed it possessed were trade secrets in contemplation of law and that the same were misappropriated by the defendants. During the course of the trial, the plaintiff designated its said alleged trade secrets as Nos. 1 to 8 inclusive in its proposed supplemental findings of fact. Since evidence, discussion and argument with respect to these alleged secrets were taken and had m camera, they will not be revealed in this opinion.
A general definition of “trade secrets” is found in the Restatement of Torts (§ 757, comment b): “A trade secret may consist of any formula, patterns, device or compilation of information which is used in one’s business, and which gives bim an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. It differs from other secret Information in a business (see § 759) in that it is not simply information as to single or ephemeral events in the conduct of the business * * *. A trade secret is a process or device for continuous *679 use in the operation of the business. Generally, it relates to the production of goods, as, for example, a machine or formula for the production of an article.”
In expansion of this general definition, the comments which follow in the Restatement discuss the element of secrecy and supply the tests to be applied in determining whether a trade secret is involved: “The subject matter of a trade secret must be a secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. Matters which are completely disclosed by the goods which one markets cannot be his secret. Substantially, a trade secret is known only in the particular business in which it is used. It is not requisite that only the proprietor of the business know it. He may, without losing his protection, communicate it to employees involved in its use. He may likewise communicate it to others pledged to secrecy. Others may also know of it independently, as, for example, when they have discovered the process or formula by independent invention and are keeping it secret. Nevertheless, a substantial element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information. An exact definition of a trade secret is not possible. Some factors to be considered in determining whether given information is one’s trade secret are: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.”
So, too, under comment a of section 757 in the said Restatement, it is stated: “ The significant difference of fact between trade secrets and processes or devices which are not secret is that knowledge of the latter is available to the copier without, the use of improper means to procure it, while knowledge of the former is ordinarily available to him only by the use of such means. It is the employment of improper means to procure the trade secret, rather than the mere copying or use, which is the basis of the liability under the rule stated in this Section.”
And it may be interesting to consider in this connection the observations of Mr. Justice Corcoran in the case of Rabinowitz & Co. v. Dasher (82 N. Y. S. 2d 431), where the learned Justice stated, at page 437: “Secrecy is a relative term. What is *680 known to several persons may no longer be secret in the strictest sense. But we are concerned with its meaning in the legal and equitable sense. Was it secret in the sense that a disclosure by an employee would lessen its value? Was it secret in the sense that third parties would be willing to pay for a breach of trust in order to ascertain its nature? ”
The defendants rely strongly on the rulings made in the cases of Kaumagraph Co. v. Stampagraph Co. (235 N. Y. 1) and National Starch Prods. v. Polymer Ind. (273 App. Div. 732) which are authority for the proposition that there can be and is no betrayal of confidence unless there is a secret to be imparted, and said defendants vigorously contend that that which the plaintiff maintains are trade secrets were and are, in fact, not secrets at all. In support of their position, they assert: (1) That some of the plaintiff’s alleged secret processes , could be determined from inspection or analysis of the plaintiff’s marketed product; (2) that others of the plaintiff’s alleged secret processes or formulations or use of machinery were familiar to all mechanics or chemists in the trade; (3) that still others could be searched out and identified in the “ prior art ” or in trade practice; (4) that a certain brand filter used in connection with the plaintiff’s filtering process, was available to anyone and could be learned from the catalogue of the manufacturer or from the salesmen representing the company manufacturing the filter and products used in connection therewith; (5) that one process, consisting of No. “ 3 ” in the plaintiff’s proposed supplemental findings of fact (therein referred to as the “ alkabize backsize process”), was revealed in certain Canadian and American patents issued respectively to the plaintiff on February 7,1950, and on April 17,1951; (6) that at least one was revealed in a trade magazine article published in 1958 and of which a third party, who was not connected with the plaintiff, was the author; (7) that others engaged in the manufacture of pressure-sensitive adhesive tapes had legitimately discovered and used some of plaintiff’s alleged trade secrets or parts or portions thereof; (8) that some were well-known processes or formulations described in expired patents issued to the plaintiff prior to the year 1951; and (9) that some were revealed in the testimony presented in two prior suits between the plaintiff and third parties instituted and heard prior to 1948.
With respect to the defendants’ aforesaid contention (1), this court is of the opinion and finds from the evidence adduced that none of the alleged trade secrets of the plaintiff (which are claimed to be trade secrets as set forth in the plaintiff’s pro- • *681 posed supplemental findings of fact under numbers “ 1 ” to“ 8 ”, inclusive) could be searched out and determined by a mere inspection of the plaintiff’s products and in any event, there is no proof in this case that the defendants ascertained plaintiff’s alleged trade secrets by an inspection or analysis of the plaintiff’s products. So, too, with respect to the defendants’ aforementioned contentions (2) and (3), this court is of the opinion and so finds from the credible evidence that none of the aforesaid alleged trade secrets were familiar to a good mechanic or chemist in the trade or that they could be searched out and found in the “ prior art ” or trade practice. This court is of the view that the observations made in the case of Fairchild Engine & Airplane Corp. v. Cox (50 N. Y. S. 2d 643) at page 656 are indeed applicable to the latter contention. There the court said, among other things, that ‘1 The doctrine of ‘ prior art ’, which the defendant invokes as a shield, is of vital importance in patent cases, but is not so significant ” in a case involving trade secrets. The court further said that “ The difference is boldly etched under the heading ‘ Novelty and prior art ’ in the 1 Restatement of Torts ’, pp. 6, 7, as follows : ‘ Novelty and prior art. A trade secret may be a device or process which is patentable; but it need not be that. It may be-a device or process which is clearly anticipated in the prior art or one which is merely a mechanical improvement that a good mechanic can make. Novelty and invention are not requisite for a trade secret as they are for patentability. * * * The protection is merely against breach of faith and reprehensible means of learning another’s secret. For this limited protection it is not appropriate to require also the kind of novelty and invention which is a requisite of patentability. ’ ” As to the defendants’ afore-mentioned contention (4), this court finds that the subject brand filter constituted a part only of the plaintiff’s filtering process. The catalogue of the manufacturer stated that its brand filter was available and useful for the filtering of “ coating materials ”. However, the catalogue did not represent or state that said filter was suitable and effective for filtering pressure-sensitive adhesives and no showing was presented that Technical Tape learned about this brand filter from the manufacturer’s catalogue or that some salesman called upon said defendant and suggested its use. Indeed, it has been established that the first of such brand filters was purchased by Technical Tape shortly after the time that Cohen conferred with Beyer, followed up a few months later by the purchase of four more of such brand filters. The defendants’ *682 assertion that they learned of the wisdom of using this brand filter through some source other than the information obtained by them from Beyer may not be sustained.
With respect to the defendants’ afore-mentioned contention (5), it should be noted that the same relates only to plaintiff’s alleged trade secret designated as No. “ 3 ” in the aforementioned plaintiff’s proposed supplemental findings of fact. This contention (5) will not be discussed at this point, but will be treated and disposed of in a subsequent portion of this opinion pertaining to the subject of the defendants’ first affirmative defense.
Accordingly, there is presented the issue as to whether the remaining claims of the defendants, consisting of (6), (7), (8) and (9), warrant a holding that the plaintiff’s alleged secrets were not in fact secret; It is the opinion of this court that this issue must be answered in the negative once it is borne in mind that the essence of the plaintiff’s present action (based upon trade secrets) is breach of faith. The evidence in this case clearly establishes that in seeking to perfect the masking tape which the defendant, Technical Tape, was manufacturing, and in seeking to produce and place upon the market a good quality . of cellophane tape, the defendants herein did not first resort, in solving their manufacturing problems, either to an examination of the plaintiff’s expired patents or to the testimony which was taken in any prior suits, nor to the aforesaid magazine article which was later published in 1958, nor did they enter upon á series of experiments to legitimately discover the solution to their problems. On the contrary, the evidence demonstrates that they were anxious to solve the problems encountered by them in the production of both tapes by the quick and easy method of inducing a breach of faith on the part of Beyer, to the end that they might have quick answers to their difficulties and at the same time, be assured that one of the leading manufacturers, if not the leading manufacturer, of these tapes had found, from its own experimentation and at its own cost, that these methods and processes as disclosed to them were the best and most efficient methods for the production of tapes of high quality. The rule seems clear that it will not do for a defendant in a trade secret cause of action founded upon a claim that the alleged trade secret was obtained through a breach of faith or the violation of a confidence, to excuse his or its conduct by the assertion that the alleged trade secrets should not be held ■to be -trade secrets in fact because the information embraced in each secret could have been discovered by diligent research or could have been ascertained by resorting to sources which the *683 defendant never explored, such as testimony in prior litigation or the examination of expired patents, or by resorting to an article in a trade magazine (subsequently published), or by the claim that others had legitimately discovered the subject trade secrets by the latters’ own diligent efforts.
In Sandlin v. Johnson (141 F. 2d 660) at page 661, the following noteworthy observation is made: ‘1 The fact, however, that another has legitimately discovered the trade secret will not permit one to whom a confidential disclosure has been made to violate the confidence, where the matter has not been generally disclosed by any of the discoverers, so as to have become public knowledge and property.”
In this respect, the credible evidence in this case would refute any contention, if such be made by the defendants, that any of the trade secrets herein had been generally disclosed by any of the discoverers thereof so as to have become public knowledge and property and accordingly, the defendants are not permitted to violate the confidence imposed upon the plaintiff’s employee even though others “ legitimately discovered” plaintiff’s trade secrets or any of them.
In Franke v. Wiltschek (209 F. 2d 493) the court’s statement is most pertinent to the defendants’ contentions with respect to their assertion that some of the plaintiff’s trade secrets were revealed in expired patents. In that case the court stated, at page 495: ‘ ‘ Defendants .argue that the heart of plaintiffs’ process was revealed by an expired patent, and that the improvements thereon were unpatentable applications of mechanical skill. This totally misconceives the nature of plaintiffs’ right. Plaintiffs do not assert, indeed, cannot assert, a property right in their development such as would entitle them to exclusive enjoyment against the whole world. Theirs is not a patent, but a trade secret. The essence of their action is not infringement, but breach of faith. It matters not that defendants could have gained their knowledge from a study of the expired patent and plaintiffs ’ publicly marketed product. The fact is that they did not. Instead they gained it from plaintiffs via their confidential relationship and in so doing incurred a duty not to use it to plaintiffs’ detriment. This duty they have breached.” (Citing cases.)
This court finds that there is no evidence worthy of belief that the defendants gained and used any knowledge of the plaintiff’s enumerated aforesaid claimed trade secrets from any of the plaintiff’s expired patents or from the plaintiff’s marketed products.
*684 The fact that the defendants claim that the information with respect to plaintiff’s alleged trade secrets was readily at hand, if they desired to search them ont, will not bear serious consideration by this court. In the case of A. O. Smith Corp. v. Petroleum Iron Works Co. (73 F. 2d 531) the court stated, at pages 538-539: 1 ‘ The mere fact that the means by which a discovery is made are obvious, that experimentation which leads from known factors to an ascertainable but presently unknown result may be simple, we think cannot destroy the value of the discovery to one who makes it, or advantage the competitor who by unfair means or as the beneficiary of a broken faith, obtains the desired knowledge without himself paying the price in labor, money, or machines expended by the discoverer. Facts of great value may, like the lost purse upon the highway, lie long unnoticed upon the public commons. Hundreds pass them by, till one more observant than the rest makes discovery. It is idle to say that, in the eyes of the law, interest may not in such case follow discernment. We think the court below was right in rejecting the master’s application of the law in respect to those secret processes held by the master to be invalid for the reason that they were in the public domain or within the reach of the skilled mechanic in the trade. ’ ’
Pertinent to the case at bar is the case of Smith v. Dravo Corp. (203 F. 2d 369) where the court held, at page 375: “ It is unquestionably lawful for a person to gain possession, through proper means, of his competitor’s product and, through inspection and analysis, create a duplicate, unless, of course, the item is patented. But the mere fact that such lawful acquisition is available does not mean that he may, through a breach of confidence, gain the information in usable form and escape the efforts of inspection and analysis. ‘ The fact that a trade secret is of such a nature that it can be discovered by experimentation or other fair and lawful means does not deprive its owner of the right to protection from those who would secure possession of it by unfair means.’ Nims, Unfair Competition and Trade Marks, Sec. 148.”
In Board of Trade of City of Chicago v. Christie Grain & Stock Co. (198 U. S. 236), the plaintiff collected stock quotations which it furnished its customers. Said Mr. Justice Holmes of its tabulations (pp. 250-251): “It stands like a trade secret. The plaintiff has the right to keep the work which it has done, or paid for doing, to itself. The fact that others might do similar work, if they might, does not authorize them to steal the plaintiff’s * * * The plaintiff does not lose its rights by communicating the result to persons, even if many, in con *685 fidential relations to itself, under a contract not to make it public, and strangers to the trust will be restrained from getting at the knowledge by inducing a breach of trust and using knowledge obtained by such a breach.”
The principles above enunciated have been followed in many of the trade secret cases in the State of New York and in other States. (See Tabor v. Hoffman, 118 N. Y. 30; Fairchild Engine & Airplane Corp. v. Cox, 50 N. Y. S. 2d 643; Vulcan Detinning Co. v. Assmann, 185 App. Div. 399; Spiselman v. Rabinowitz, 270 App. Div. 548; Extrin Foods v. Leighton, 202 Misc. 592; Vulcan Detinning Co. v. American Can Co., 72 N. J. Eq. 387 and Peabody v. Norfolk, 98 Mass. 452.)
Nor are the defendants aided by the claim that one or more competitors of the plaintiff were able, by their own experimentation, to discover some of the plaintiff’s alleged trade secrets. The cases hereinabove cited constitute authority for the rule that in an action of this nature, it is not incumbent upon the plaintiff to establish that an absolute degree of secrecy existed with respect to its alleged trade secrets. Indeed, the said cases support the rule, as stated in volume 43 of Corpus Juris Secundum at page 751, that qualified secrecy is sufficient. There it is said: “ While it is not necessary, in order to justify relief by injunction, that a formula or process be wholly secret, qualified secrecy being sufficient, nevertheless there must be a substantial element of secrecy so that, except by the use of improper means, third persons would have difficulty in acquiring the information needed for making the product.” And at page 754 of the same work and volume it is also stated: “ Where there is a contract or duty on the part of an employee or other person not to disclose a trade secret entrusted to him, equity will restrain the use of information acquired in violation of that contract or duty by persons having notice or knowledge of it; and this is so although such persons might in time have reached the same result by their own independent experiments or efforts. Nevertheless, in an action to enjoin a defendant from using a secret process disclosed to him by such employee, complainant must prove the existence of such process, its value in his business, his right to the use of the secret, and that the secret was communicated to the employee while in a position of trust, so as to make it inequitable for him to disclose it to the prejudice of his employer.”
From a consideration of all of the evidence existing in the record before this court together with the inferences which may be reasonably drawn therefrom, this court finds that the plaintiff’s alleged trade secrets, as set forth in the plaintiff’s proposed *686 supplemental findings of fact, were substantially secret and that the same were unlawfully appropriated via the defendant, Beyer, who stood in a confidential relationship with the plaintiff and who had not only agreed by express contract but who was also required by an agreement implied in law not to disclose the information which had been imparted to him by the plaintiff while in the position of trust and confidence which he occupied.
At this point this court believes it necessary to discuss the ■ so-called “ Laux-3M ” relationship. Laux, while an employee of Technical Tape, sought and obtained employment from the plaintiff and approximately one year later, proceeded to obtain admissions of Beyer (through tape recordings of conversations had between Laux and Beyer at the Hotel Grosvenor in New York City), that he, Beyer, had transmitted trade secrets of the plaintiff to Technical Tape, Cohen and Shalita. There is no question but that plaintiff gave Laux a substantial amount of money and benefits for obtaining these admissions as well as other information relating to the conduct of Beyer and the other defendants which he had procured for the plaintiff on prior occasions and with respect to which he testified at the trial before this court. One month after the aforesaid tape recording was obtained, an additional tape recording of conversations had between Beyer and a supposed “ backer ” of a new tape company which pretended to offer Beyer employment was procured (with Laux’ knowledge and co-operation) at the Hotel Commodore in New York City and in these conversations, Beyer, in substance, confirmed in part and supplemented in part the statements which he had previously made in the first recorded interview at the Hotel Grosvenor. Consistent with its ruling made during the course of the trial, this court has in no way considered the admissions and statements of Beyer embraced within each of the aforesaid tape recordings as binding upon the other defendants herein. However, in its determination of the pertinent factual issues herein, this court has considered, as binding on all defendants, the sworn statements made by Beyer who, while being examined before trial in this action, recanted the numerous false denials and other false testimony (procured and instigated by Cohen and Shalita) contained in the testimony which he had previously given during said pretrial examination; and the consideration given by this court to the testimony which Beyer gave on his recantation was not influenced in any way by Beyer’s attempts to disavow said recantation at a subsequent session of the pretrial examinations in this action nor by the numerous brazen changes made in the typed transcript of the testimony given by Beyer in the course *687 of said pretrial examinations. Upon a consideration of Laux’ conduct and activities, this court notes that it has not given credence to his testimony except where the same was corroborated by other satisfactory proof or by documentary evidence. It may also here be noted that some time prior to the trial of this action, Beyer departed from this State. At the trial of this action he failed to appear in person or by an attorney and defaulted.
Turning now to a consideration of the aforesaid two alleged defenses contained in the defendants’ answers, it is to be observed that the first of these affirmative defenses is to the effect that the plaintiff possesses no trade secrets separate and apart from claims and disclosures made in United States patents issued to and owned by the plaintiff, and that by reason thereof, any remedy for alleged misuse or misappropriation of plaintiff’s improvements, inventions or discoveries relating to and useful in the manufacture of pressure-sensitive tape products is beyond the jurisdiction of this court and may be adjudged only by the Federal courts. And the second affirmative defense is to the effect: (a) That to the extent that the plaintiff’s alleged trade secrets are not embraced within the patents issued to the plaintiff, the same were widely known and used by others engaged in the manufacture of pressure-sensitive adhesive tape products and were available to those desiring to obtain the same from manufacturers of raw materials and manufacturers of machinery insofar as the same are used and useful in the manufacture of products involving pressure-sensitive adhesive tape; and (b) that the plaintiff, by certain acts and practices, has violated the anti-monopoly laws of the State of New York and of the United States with the result that the “ Technical Agreement ” relied upon by the plaintiff is illegal and unenforcible, and with the further result that the plaintiff has not come to this court with clean hands and may not have the relief which it seeks.
With respect to the first afore-mentioned alleged affirmative defense, this court finds that the same has not been sustained and is overruled, except as to item “3” set forth in the aforementioned plaintiff’s proposed supplemental findings of fact. In this court’s view, said item “3” — the “ alkabize backsize process ” — was and is contained and disclosed in patents issued to the plaintiff, one known as the American Patent, applied for on February 1, 1946 and issued on April 17, 1951, and the other known as the Canadian Patent, applied for on November 18,1946 and issued on February 7, 1950. It should be remembered that Beyer first met with Cohen in March of 1951, and the aforementioned patents were issued to the plaintiff respectively on *688 February 7,1950 and on April 17,1951. Further, it appears that the plaintiff concedes that Beyer gave Technical Tape and it appropriated the information consisting of said item “ 3 ” subsequent to May 28, 1951. Accordingly, it seems clear that any appropriation which the defendants made of said item “3” occurred subsequent to the issuance of the aforesaid patents. The rule seems clear that where, as here, the plaintiff has failed to establish either the fact that prior to the issuance of the aforesaid patents it had obtained an adjudication of the misappropriation of its trade secret with a decree enjoining the disclosure and use of the same or that at the time of the issuance of said patents there existed in its favor a pre-existing cause of action based upon the misappropriation of the subject trade secret, its remedy must consist solely of an action in the Federal courts based upon the infringement of the patent possessed by it. (Cf. Shellmar Prods. Co. v. Allen-Qualley Co., 87 F. 2d 104; A. O. Smith Corp. v. Petroleum Iron Works Co., 74 F. 2d 934 and Adolph Gottscho, Inc. v. American Marking Corp., 18 N. J. 467.)
With respect to that portion of the second affirmative defense designated under item “ (a) ” above, this court finds, upon all of the evidence in the record, that the plaintiff’s trade secrets were not widely known and used by the outside world or that any of the same were available from manufacturers; and although some of these secrets may have been known and used in rare instances by a few firms which had discovered the same through their own diligence and research, that fact, as herein-above held, does not excuse or aid the defendants where the subject secrets were obtained by them through a breach of trust and confidence. As to the remaining portion of the said second affirmative defense designated under item “ (b) ” above, this court holds that the defendants have failed to establish that the anti-monopoly laws, State or Federal, had been violated by the plaintiff, or that the plaintiff has come to this court with such unclean hands that the relief which it seeks should be denied it. (In this latter regard see Rabinowitz & Co. v. Dasher, 82 N. Y. S. 2d 431, 441, 442, and Extrin Foods v. Leighton, 202 Misc. 592, 602-603.)
Coming now to a consideration of the form and extent of the relief to which the plaintiff is entitled, it clearly appears: (a) that masking tape as well as cellophane tape could not be manufactured by one who had knowledge only of the trade secrets set forth in the plaintiff’s proposed supplemental findings of fact; (b) that Technical Tape had been manufacturing *689 and selling masking tape prior to the time that Beyer was interviewed ; and (c) that the Cofax Corporation, which had employed Shalita in its tape division department, was manufacturing a cellophane tape under the guidance, at least in part, of Shalita. It also appears from the record before this court that there are numerous steps with relation to the manufacturing of masking tape as well as cellophane tape which are not secret and apparently are well known to and used by others in making both types of tape. It further seems to be clear that Shalita had some experience in the tape business and a general knowledge of some of the steps to be taken with respect to the manufacture of both type of tape aside from those trade secrets of the plaintiff which were imparted to him and others in Technical Tape by Beyer. The cases indicate that if a defendant’s entire operation has been built upon techniques, methods, materials and designs wrongfully appropriated from a plaintiff, then an injunction against the manufacturer of the entire product is appropriate. On the other hand, where a technician reveals one or more restricted processes to a competitor of the owner of said processes, then the injunction should be limited only against the disclosure and use of the specific processes which have been revealed and appropriated. (See Franke v. Wiltschek, 115 F. Supp. 28, affd. 209 F. 2d 493; Colgate-Palmolive Co. v. Carter Prods., 230 F. 2d 855, and Head Ski Co. v. Kam Ski Co., 158 F. Supp. 919, 924.) In this court’s view, the case at bar falls within the latter category. A permanent injunction may therefore issue herein restraining all of the defendants from (a) disclosing or using in the manufacture of masking tape, items “ 1 ”, “ 2 ”, “ 4 ”, “ 5 ”, “ 6 ” and “ 7 ” described in plaintiff’s proposed supplemental findings of fact; and (b) disclosing or using in the manufacture of cellophane tape, items “ 2 ”, “ 4 ”, “ 5 ”, “ 6 ”, “7 ” and “8” described in plaintiff’s proposed supplemental findings of fact.
The court concludes that the plaintiff is entitled to judgment containing the injunctive relief above described and in addition, all of the defendants will be required to account for the profits earned from the manufacture and/or sale of masking tape and cellophane tape manufactured and sold since May 28, 1951, and will also be held liable for the damages sustained by the plaintiff for the wrongful appropriation of the afore-mentioned processes which are the subject of the injunctive relief above described. (As to the right to said damages, see Colgate-Palmolive Co. v. Carter Prods., supra, p. 865, and Hoeltke v. C. M. Kemp Mfg. Co., 80 F. 2d 912, 922-923.) However, with respect to the defendant, *690 Beyer, his liability as a joint tort-feasor for the defendants’ profits and the plaintiff’s damages will be limited to the date on which he terminated his relationship with the defendant, Technical Tape. The plaintiff is allowed the taxable costs and disbursements of this action.
This court has reviewed the proposed findings of fact and conclusions of law submitted by both parties. Except as herein found, the proposed findings of fact are refused, and except as herein granted, the proposed conclusions of law are denied. In the light of this court’s finding that the plaintiff possessed the trade secrets set forth in the plaintiff’s proposed supplemental findings of fact, said proposed supplemental findings as well as the defendants’ proposed findings have been ordered sealed by this court.
The foregoing constitutes the written and signed decision of this court, pursuant to section 440 of the Civil Practice Act, upon which judgment, as above provided, may be entered.
Settle on notice judgment granting the injunctive relief above described and which shall contain interlocutory provisions for the appointment of a Referee to ascertain and compute the plaintiff’s damages as above mentioned and the profits enuring to the defendants from the manufacture and/or sale of masking tape and cellophane tape since May 28, 1951 as to all defendants other than Beyer, and as to Beyer, from May 28, 1951 to September 30,1955.